21 F.3d 399
 Marilyn Lee WORTHINGTON, Individually, as Personal
Representative of the Estate of Frank Smoot Worthington,
III, deceased, and as the duly appointed Executrix of the
Estate of Frank Smoot Worthington, III, and as Mother and
Natural Guardian of Frank S. Worthington, IV and Matthew
Miles Worthington, Plaintiff-Counter-Defendant, Appellant,
v.
UNITED STATES of America, Defendant-Counter-Claimant, Appellee.
 No. 93-8109.
 United States Court of Appeals,
Eleventh Circuit.
 May 23, 1994.
 
 David Timothy Whitworth, Fendig, McLemore, Taylor & Whitworth, Brunswick, GA, Robert L. Parks, Ralph O. Anderson, Anderson, Moss, Parks, Meyers & Sherouse, P.A., Miami, FL, for appellant.
 Lawrence B. Lee, Asst. U.S. Atty., Savannah, GA, Sarah P. Collins, U.S. Dept. of Justice, Torts Branch, Civil Div., Wendy Rome, Washington, DC, for appellee.
 Appeal from the United States District Court for the Southern District of Georgia.
 Before BLACK, Circuit Judge, MORGAN and FAY, Senior Circuit Judges.
 FAY, Senior Circuit Judge:
 
 
 1
 This appeal arises from plaintiff's Federal Tort Claims Act suit against the United States to recover damages for the wrongful death of her husband who died along with three passengers when the airplane he was piloting crashed. Appellant alleges that the district court misapplied Florida tort law by entering judgment for defendants after a bench trial. We agree, REVERSE the judgment, and REMAND for consideration of damages.
 
 I. BACKGROUND
 
 2
 Plaintiff's husband was an experienced commercial and private pilot holding multiple licenses and flight ratings. On November 13, 1988, he flew three professional golfers from St. Simons Island, Georgia to Jacksonville, Florida. The short flight took place entirely in clear, calm skies. These weather conditions prevailed except at the Jacksonville airport where very dense fog moved in from the east. Air traffic controllers cleared Mr. Worthington for an instrument approach (IFR).[1] As he reached decision height, soupy fog engulfed the plane. Within seconds the single engine aircraft crashed in a densely wooded area near the runway. Mr. Worthington and all three passengers died.
 
 
 3
 Plaintiff sued under the Federal Torts Claim Act, 28 U.S.C. Secs. 1346(b), 2671-2680, alleging that government air traffic controller negligence caused the crash. Following a bench trial, the district court entered judgment for the defendant, finding that decedent's negligence was the sole cause of the accident. Worthington v. United States, 807 F.Supp. 1545, 1570 (S.D.Ga.1992). The district court's comprehensive and well-written memorandum sets forth its findings of fact and conclusions of law.[2] We adopt the vast majority of the trial court's findings and discuss the facts and testimony only where necessary.
 
 
 4
 The single issue before this Court is whether the district court correctly applied Florida negligence principles in reaching its determination that decedent's intervening actions superseded any air traffic controller negligence, thereby absolving defendant of all liability. Id. at 1569. To answer that question of law we must examine its factual predicates.
 
 II. STANDARD OF REVIEW
 
 5
 This appeal requires review of both findings of fact and conclusions of law. Federal Rule of Civil Procedure 52(a) provides that a district court's findings of fact in actions tried without a jury may not be reversed unless clearly erroneous. Fed.R.Civ. 52(a). A finding is clearly erroneous when the reviewing court, after assessing the evidence, "is left with a definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The district court's "application of the legal standard [of due care] to the facts of the case (i.e., the determination on the ultimate question of negligence) is reviewed under the 'clearly erroneous' standard." Daley v. United States, 792 F.2d 1081, 1086 (11th Cir.1986), quoting Miller v. United States, 587 F.2d 991, 994 (9th Cir.1978). We also apply that standard to "the determination of proximate causation." Id. This Court may correct errors of law or findings of fact based on "misconceptions of the law," Meek v. Metropolitan Dade County, 985 F.2d 1471, 1481 (11th Cir.1993), and we review the district court's conclusions of law de novo. Newell v. Prudential Ins. Co., 904 F.2d 644, 649 (11th Cir.1990).III. ANALYSIS
 
 A. Findings of Fact
 
 6
 We accept the district court's statement of the uncontested facts and thorough introduction to key terms and duties. See Worthington, 807 F.Supp. at 1548-53. Our inquiry focuses on one narrow but critical factual dispute: Was Mr. Worthington spatially disoriented just before the crash, and if so, why?
 
 
 7
 Appellants argue that the proximate cause of the crash was the traffic controllers' failure to switch Mr. Worthington from approach to local control on time, failure to update weather information, and failure to precisely transmit to the decedent information provided by planes landing or attempting to land moments before him. Specifically, decedent, whose decision height was 200-feet, did not know when he reached that altitude that: (1) visibility at the airport had deteriorated to only one-sixteenth of a mile; (2) because of fog the local controller in the tower could not see a commercial jet that had just landed; (3) the jet's pilot had difficulty taxiing because visibility was so poor; (4) the jet's pilot reported that the bottom of the fog was sitting at 100 feet or CAT II minimums; and (5) another pilot who had just executed a missed approach reported that the fog extended to 250 feet above the surface of the runway. Plaintiff asserts that this lack of information and misinformation caused decedent's spatial disorientation, resulting in loss of control, a veer to the left, and ultimately the crash.
 
 The district court disagreed, stating:
 
 8
 ... the evidence herein of spatial disorientation is very speculative and questionable. Spatial disorientation is of itself not uncommon and pilots are trained to handle it. However, under the evidence presented, the Court does not credit testimony that Worthington suffered spatial disorientation as claimed by plaintiff.
 
 
 9
 Worthington, 807 F.Supp. at 1553. The court made this credibility determination after weighing expert testimony. Id. at 1563 n. 22. The district court also noted that decedent "appeared calm." Id. at 1564, p 71(c)(d). Thus, the court discounted plaintiff's claim that the controllers' negligence increased decedent's workload just before the crash, aggravating the spatial disorientation. Id. at 1564, p 71(e).
 
 
 10
 Recognizing that credibility determinations are for the finder of fact, we reverse conclusions of this sort only when the weight of evidence so requires. Smith v. PAPP Clinic, P.A., 808 F.2d 1449, 1452 (11th Cir.1987). Our review of the record leaves us with a definite and firm conviction that a mistake occurred in the factual findings, and that conclusions of law resting on those findings are in error.
 
 
 11
 Evidence of Spatial Disorientation and its Cause
 
 
 12
 During the trial three experts testified about spatial disorientation.
 
 
 13
 1. Plaintiff's first expert was Dr. Samuel Green, a medical doctor and a pilot. Dr. Green testified by deposition. RV6-263. He distinguished spatial disorientation from vertigo, explaining that vertigo "is generally considered to originate within the vestibular mechanism and causes a feeling of either the individual moving or the external world moving," while "disorientation is brought upon by lack of information, generally considered to come from outside." Green Depo. at 17. He then described their varying effects. "[V]ertigo is caused by the inner ear disorder, if it is not too severe, it is not too difficult to overcome that and compensate for that." Green Depo. at 18. Regarding disorientation, however, Dr. Green stated:
 
 
 14
 If one lacks information, though, it is practically impossible to overcome that until one finds appropriate information to replace that with and then reorients himself to the environment. A good example would be a high-altitude, high-performance spin that a fighter airplane might go into in a maneuver. He would be disoriented until he was able to see the horizon or stabilize his instruments and then re-establish his orientation to the environment.
 
 
 15
 Green Depo. at 18-19. Dr. Green opined that decedent became disoriented due to "misinformation and lack of information passed to him by the approach control authority," with such disorientation occurring at his 200-foot decision height, approximately eight to twelve seconds before the crash. Green Depo. at 27-28. The expert listed five factors contributing to decedent's disorientation: (1) inadequate initial information at the terminal check-in as to weather conditions he could expect to find on landing, (2) inadequate time to line up for an instrument landing due to the delayed turnover from approach to local control, (3) lack of weather information between being cleared for approach outside the marker and reaching decision height, (4) misinformation leading him to believe he would encounter visual conditions at decision height, and (5) the late transfer that increased his workload as he approached decision height. Dr. Green clarified:
 
 
 16
 A steady stream of a lack of information and untimely information can contribute to an environment which will cause disorientation, and this is, in my opinion, what happened at this instance. Had he been given accurate and timely information, he would not have experienced disorientation and the crash would not have occurred.... had he been given a timely and accurate and continuing flow of information during--before and during the approach, he would not have experienced disorientation and the crash would not have occurred.
 
 
 17
 Green Depo. at 64. Emphasizing that disorientation is, by definition, a lack of information, Green Depo. at 64, the witness described how defendant's negligence affected decedent's visual, aural, and tactile senses. Green Depo. at 65-58. Dr. Green concluded that after decedent recovered from the disorientation he attempted to complete a missed approach, was unable to do so, and crashed. Green Depo. at 72.
 
 
 18
 2. Plaintiff's second expert was Alan Wilkinson, a pilot. He defined spatial disorientation as a psychologically or physiologically based "loss of sense of relationship to the horizon." RV7-133. Wilkinson's testimony conformed to Green's in attributing to defendant many erroneous or misleading communications that "established in Mr. Worthington's mind the belief that when he reached his minimums of 200-feet, he was going to find an environment that would allow him to safely and effectively land the aircraft in visual conditions." RV7-134. Wilkinson suggested that misinformation and the physiological phenomenon of vertigo converge. RV7-135-36. Wilkinson referred to this combined effect as "spatial disorientation," which occurred when decedent had to alternately scan his instruments and raise his head vertically to refocus outside when he reached decision height and realized that he was still in fog. RV7-224, 233. The expert agreed that pilots are trained to "watch out" for spatial disorientation. RV7-226. He suggested that decedent "overcame the vertigo" and was using his instruments (consistent with pilot training) when he hit the trees. RV7-226. Under cross-examination, Wilkinson admitted that the United States "didn't cause the disorientation." RV7-229. But on redirect, he clarified that the spatial disorientation was a manifestation of the controllers' failure to properly manage the aircraft. RV7-230.
 
 
 19
 3. Defendant's expert was Bernard Coogan, a pilot and a lawyer. Coogan first mentioned disorientation "leading to vertigo" when describing the importance of using instruments when there are no references for visual flight. RV8-29-30. Coogan testified that head movement causes spatial disorientation, but that he did not believe decedent had to move his head to look from his instruments to the outer environment. RV8-59. He described spatial disorientation as a "misunderstanding or confusion as to your position in space," and a lesser form of vertigo. RV8-108. He then agreed that decedent experienced spatial disorientation as evidenced by his continued descent. RV8-109. According to Coogan, Worthington was "disoriented in relation to where the trees were and where he was," and "disoriented in relation to his direction." RV8-109. Coogan attributed the disorientation to pilot error (failure to monitor and fly by all of his instruments), instead of controller misinformation and lack of information. RV8-109. He opined that spatial disorientation is "cured" by relying on one's instruments. RV8-110.
 
 
 20
 On cross-examination, plaintiff's counsel asked Coogan what caused the plane's deviation to the left just before impact. The witness testified at deposition that spatial disorientation was to blame in the left turn, and that "spatial disorientation allowed [Worthington] not to control the airplane properly." RV8-185. Coogan admitted during trial "there can be no doubt that this pilot experienced some disorientation as to his direction." RV8-186. However he retreated from his earlier testimony by concluding that decedent's failure to rely on his instruments caused the disorientation, which resulted in the left turn. RV8-188.
 
 
 21
 The record provides uncontroverted expert testimony that decedent experienced spatial disorientation before the crash. Defendant's expert agreed that disorientation occurred, and only disagreed as to its cause. The fact that pilots are trained to respond to disorientation does not negate the phenomenon's viability or effect in the seconds before recovery. Knowing "how to counteract" disorientation, id. at p 71(a), does not prevent its occurrence. Nor do we attribute significance to decedent's "calm" in the moments preceding his death. Id. at 1563-64, p 71(c)(d). Pilots are trained to conduct themselves calmly when under stress. Decedent was in a small four-seater airplane with paying passengers seated just beside and behind him. We read nothing into his calm transmissions beyond the performance of a professional pilot responding appropriately to a difficult landing situation. Accordingly, we cannot accept the district court's finding of fact that there was no spatial disorientation. Id. at 1563, p 71.
 
 
 22
 The trial court also concluded that defendant's negligence in no way contributed to decedent's spatial disorientation. Id. at 1564, p 71(e). The great weight of the evidence supports a contrary finding that misinformation and lack of information led directly to Worthington's spatial confusion when he reached decision height.[3] Based on the information at his disposal, decedent thought he would break through the fog at decision height and have visual references sufficient to complete a landing. The controllers deprived him of accurate information, so that Mr. Worthington reached 200 feet and unexpectedly found the plane shrouded in fog. He looked out for any of nine approved visual reference points,[4] experienced spatial disorientation as he scanned for those identifiers and looked back at his instruments, struggled to reorient himself using his instruments, and probably attempted to execute a missed approach just before hitting the trees. Once disorientation occurs a pilot can do no more than reorient himself as quickly as possible to his instruments, and pull up.
 
 
 23
 Defendant's expert's conclusions do not preclude this finding. Coogan blamed the disorientation on Worthington's failure to rely on his instruments, but he acknowledged that at decision height a pilot must look up and out, and rely on visual references outside the airplane. Attempting to do just that, decedent became disoriented, and had to switch to instrument control. All of the evidence leads to this conclusion. Furthermore, Coogan agreed that this disorientation caused the left turn. Accordingly, we find overwhelming evidence that Mr. Worthington became spatially disoriented because of the air traffic controllers' negligence, and that the plane's movement to the left as it crashed was also attributable to the disorientation.
 
 
 24
 Finding that the district court was clearly erroneous in discounting Worthington's spatial disorientation and concluding that the controllers' negligence did not contribute to that disorientation,[5] we move forward to apply the law to the facts de novo.
 
 B. Conclusions of Law
 
 25
 The trial court correctly stated that Florida uses a "pure" comparative negligence rule where if both parties are at fault, the plaintiff's recovery is limited to the proportion of damages that defendant's negligence proximately caused. Id. at 1566 n. 24.[6] Nonetheless, the court determined that "given the evidence [there was] no basis for assessing comparative negligence on the parties." Id. The district court ruled that any causal effect occasioned by the controllers' failure to disseminate weather information was "superseded by [Worthington's] intervening actions." Id. at 1569. Appellant asserts that the court misapplied Florida comparative negligence principles to arrive at an erroneous legal conclusion. This error was compounded, urges appellant, by the faulty factual finding regarding decedent's disorientation.
 
 
 26
 Florida negligence principles, especially where superseding intervening causes come into play, are tricky at best. Florida courts alternately use the terms "superseding cause," "intervening cause," "superseding intervening cause," and "efficient intervening cause" to describe scenarios involving more than one negligent actor.[7] Our discussion necessarily encompasses and attempts to distinguish those terms and their correlation to comparative negligence. We conclude that the trial court erred in failing to apportion liability through comparative negligence principles.
 
 1. Florida Law
 
 27
 Any discussion of Florida negligence principles must begin with Hoffman v. Jones, 280 So.2d 431 (Fla.1973), where the Florida Supreme Court replaced the harsh contributory negligence rule with principles of comparative negligence. The court directed that where both plaintiff and defendant are at fault, juries should apportion negligence between plaintiff and defendant, and award the plaintiff accordingly. Id. at 438. Under comparative negligence, plaintiffs are barred from recovering damages "only when the plaintiff's negligence is the sole legal cause of the damage...." Id.
 
 
 28
 In Gibson v. Avis Rent-a-Car System, Inc., 386 So.2d 520 (Fla.1980), the Court analyzed an alleged "efficient intervening cause" under the comparative negligence scheme. Id. at 521. Gibson was injured after defendant stopped his car in the middle of the highway, requiring plaintiff's car and other cars behind him to stop as well. Id. The fourth car in line hit plaintiff's stopped vehicle. Id. Defendant attempted to evade liability by suggesting that the fourth car's actions were an intervening cause. Id.
 
 
 29
 Without defining an "efficient intervening cause," the Court characterized the question as one of "responsibility," holding that if an intervening cause is foreseeable, the original negligent actor may still be held liable. Id. at 522. Foreseeability is a question of fact that may be tested by asking "whether the harm that occurred was within the scope of the danger attributable to the defendant's negligent conduct." Id. That analysis may be informed by the legislature, by the particular defendant's actual knowledge that the same type of harm has resulted in the past from the same type of negligent conduct, or by recognition that the type of harm in question "has so frequently resulted from the same type of negligence that 'in the field of human experience' the same type of result may be expected again." Id. at 522-23 (internal citations omitted). The Court determined that in the field of human experience the harm that occurred was of precisely the type foreseeable when one stops a car in the middle of a highway. Id. Reversing a directed verdict for the defendant, the Court held that such a foreseeable result could not be called an efficient intervening cause. Id.
 
 
 30
 In Department of Transp. v. Anglin, 502 So.2d 896 (Fla.1987), the Florida Supreme Court held that an "independent, efficient, intervening cause" broke the chain of causation. Plaintiffs' car stalled after water accumulating in the road doused their engine. Id. They attempted to restart it by having one passenger "pop the clutch" while the others pushed. Id. Meanwhile, a passing driver decided to stop and help, made a U-turn, approached at forty miles per hour, and slammed into the back of the plaintiffs' vehicle causing serious injuries. Id. at 897. Plaintiffs attempted to hold the Department of Transportation liable based on the theory that had the water not accumulated on the road their car would not have stalled and no injury would have occurred. The state Supreme Court cried "foul," holding that the passing driver's actions constituted "an independent, efficient, intervening cause" of plaintiffs' injuries. Id. at 898.
 
 
 31
 Although defendants' negligence was a factual cause of the accident, the Court determined that such negligence "simply provided the occasion for the negligence of another." Id., and id. at 900. The Court distinguished Gibson, where defendant's action "set in motion" a chain of events culminating in injury to the plaintiff. Id. at 898.
 
 
 32
 The Court instructed that where intervening causes are alleged, the proper analysis entails more than simply factual causation. Id. at 899. As a policy matter, the Court announced, tort liability does not attach to all conduct factually "caused by a defendant." Id. Citing Stahl v. Metropolitan Dade County, 438 So.2d 14, 21 (Fla.Dist.Ct.App.1983), the Court reframed the inquiry:
 
 
 33
 Florida courts, in accord with courts throughout the country, have for good reason been most reluctant to attach tort liability for results which, although caused-in-fact by the defendant's negligent act or omission, seem to the judicial mind highly unusual, extraordinary, bizarre, or stated differently, seem beyond the scope of any fair assessment of the danger created by the defendant's negligence. Plainly, the courts here have found no proximate cause in such cases based solely on fairness and policy considerations, rather than actual causation grounds.
 
 
 34
 Id. (emphasis added).
 
 
 35
 Applying those standards, the Court held that the passing driver's actions were an independent, intervening cause "so far beyond the realm of foreseeability that, as a matter of law and policy, the [defendant] cannot be held liable for [the plaintiffs'] injuries." Id. at 899-900. The Court concluded that "it was not reasonably foreseeable that [the passing driver] would act in such a bizarre and reckless manner." Id. at 900.
 
 
 36
 A few months later, in Palm Beach County Bd. of County Comm'rs v. Salas, 511 So.2d 544 (Fla.1987), the Court applied its recently announced test and reached an opposite result. This suit arose when a car driven by Blount struck plaintiff's vehicle due to a hazardous condition created when the county blocked off a turn lane while performing road maintenance. Id. at 545. The county failed to properly separate motorists negotiating the work site. Id. Against defendant's claim that the Blount's conduct was an intervening cause absolving it of liability, the Court held that her actions "were not so unforeseeable that the county should be relieved, as a matter of law and policy, of all liability." Id. at 547. Blount approached the intersection planning to turn left, received no direction as to whether she could do so, became confused, and turned when the only working traffic signal changed to green, striking plaintiff's vehicle. Id. The Court stated:
 
 
 37
 Blount's confusion at this busy and now more dangerous intersection was not some remote possibility, it was easily foreseeable. The fact that Blount was negligent when she turned left does not render her action so bizarre, unusual or outside the realm of the reasonably foreseeable that the county's actions did not also proximately cause the [plaintiffs'] injuries.
 
 
 38
 Id. The Court reversed the directed verdict for defendant and remanded for consideration under appropriate comparative negligence principles. Id.
 
 2. Application of Florida Law to the Facts
 
 39
 The district court concluded that Worthington's actions constituted "an intervening cause." Worthington, 807 F.Supp. at 1569. "Any contributing effect of the air traffic controllers was displaced by the actions of the pilot when he saw and reacted to the presence of the fog." Id. at 1570. The court relied on Florida District Courts of Appeals' decisions:
 
 
 40
 Under Florida law, once a negligent act occurs, the actor will be liable for any injury that flows therefrom, unless an unforeseeable act independently intervenes to cause the loss. In order to be an intervening cause sufficient to break the chain of causation, however, the intervenor's negligence must be truly independent of and not set in motion by the original negligence.
 
 
 41
 Id. (citations omitted).
 
 
 42
 The court did not apply the proper legal standard as we understand it after reviewing Florida Supreme Court precedent. The legal issue is whether the decedent's spatial disorientation, leading to loss of control of the plane and the crash, was so bizarre and extraordinary, or so far beyond the realm of foreseeability, that as a matter of fairness and policy it should relieve defendant of all liability.
 
 
 43
 We recognize that the district court's conclusion put a spin on Florida precedent, easily leading to a "misconception of law." Meek, 985 F.2d at 1481. The Florida cases discussed all involve a policy justification for absolving a defendant of liability for plaintiff's injuries because a third party tortfeasor's actions were bizarre and beyond the realm of foreseeability. See also Stahl v. Metropolitan Dade County, 438 So.2d at 22-23 (referring to plaintiff's and the third party tortfeasor's negligence collectively as "intervening causes-in-fact"). Here, we must decide if plaintiff's actions, absent any third party negligence, were so bizarre and unforeseeable that they should relieve defendant of all liability, or if the scenario simply calls into play established principles of comparative negligence. This twist is not troubling because we have no difficulty deciding that plaintiff's actions were neither bizarre nor unforeseeable.
 
 
 44
 Spatial disorientation and the failure to successfully execute a missed approach are precisely the harm that this defendant should have expected after depriving Mr. Worthington of accurate and timely information about weather conditions when he approached a landing strip shrouded with fog. Worthington's disorientation and subsequent attempt to reorient himself and execute a missed approach leading to the crash were entirely foreseeable.[8] All of the experts agreed that spatial disorientation is the primary concern of all who are involved in IFR approaches.
 
 
 45
 The district court distinguished Ingham v. Eastern Air Lines, Inc., 373 F.2d 227 (2nd Cir.), cert. denied, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967), saying "[t]he crux of the Ingham opinion is the deceptive nature of the information given the Eastern crew versus what the actual weather conditions were." Worthington, 807 F.Supp. at 1570. We cannot agree that the air traffic controllers did not give Worthington any misleading information. Decedent did not have the best possible weather information when he reached decision height because of a series of imprecise communications combined with an absence of communication. We, like the Second Circuit, specifically reject the government's contention that it must be relieved of liability because the pilot's failure to execute a missed approach was an intervening superseding cause. Ingham, 373 F.2d at 237 n. 11. Like the Second Circuit,
 
 
 46
 [w]e are unable to conclude that the accident was not reasonably foreseeable as a result of the government's negligent failure to provide up-to-date weather information. Indeed, the government was the original wrongdoer whose negligence set in motion the entire chain of events which finally culminated in the tragic crash. The government's negligence was ever present.
 
 
 47
 Id. (emphasis added).
 
 
 48
 Plaintiff urges us to consider whether defendant may implicate "implied assumption of the risk" to bar recovery. Florida law readily supplies an answer. In Blackburn v. Dorta, 348 So.2d 287 (Fla.1977), the Court merged the doctrine of assumption of the risk with comparative negligence. See Kendrick v. Ed's Beach Service, Inc., 577 So.2d 936 (Fla.1991); Mazzeo v. Sebastian, 550 So.2d 1113 (Fla.1989). Plaintiff's recovery may not be barred because Mr. Worthington attempted to land at the Jacksonville airport despite his awareness of deteriorating weather conditions. Nor does the law bar recovery because decedent failed to execute a missed approach. If Mr. Worthington was negligent, Florida precedent dictates that such negligence goes to apportion, not bar, liability.
 
 IV. CONCLUSION
 
 49
 We hold that the district court's findings of fact regarding Mr. Worthington's spatial disorientation were clearly erroneous. Taking into account our finding that the decedent was disoriented, and that such disorientation was proximately caused by the air traffic controllers' negligence, we rule that as a matter of law any pilot error was not a superseding intervening cause under Florida law that bars plaintiff's recovery. We REVERSE and REMAND for consideration of damages in accord with Florida's comparative negligence principles.
 
 
 50
 REVERSED and REMANDED.
 
 
 
 [1]
 "An IFR flight plan allows pilots to fly in clouds without reference to the ground.... when under an IFR flight plan and in the process of landing, a pilot is required to execute a missed approach if, upon reaching decision height, he does not sufficiently have the runway in sight to make a safe landing." Worthington v. United States, 807 F.Supp. 1545, 1549 (S.D.Ga.1992). Decision height is that height at which a pilot must decide based on visual, rather than instrument references, either to go forward with a landing or execute a missed approach. Id. at 1549 n. 2 (listing nine visual references for a pilot's consideration upon achieving decision height; if none is visible, the pilot must execute a missed approach)
 
 
 [2]
 The record in this matter reflects the trial court's continuous inquiry into the nuances of flying airplanes in this country and the relationship between pilots and controllers. We admire and appreciate the attention given to the technical terms and to the procedures involved in an IFR approach to a controlled airport
 
 
 [3]
 The trial court agreed that much of this information "would have been helpful" to Worthington, but concluded that it was not pertinent because decedent should have been "ready and able to execute a missed approach if the fog obscured his vision upon reaching decision height." Worthington, 807 F.Supp. at 1560
 
 
 [4]
 See supra n. 1
 
 
 [5]
 The district court seemingly disregarded abundant evidence that spatial disorientation, not vertigo, occurred. Worthington, 807 F.Supp. at 1563 n. 22, and similarly overlooked the experts' testimony that spatial disorientation is more, not less, difficult to overcome than vertigo. Id. at 1562 n. 19. Confusing findings also appear in paragraph 71(a), id. at 1563, where the court concluded that pilots must rely on their instruments to avoid disorientation during approach, and paragraph 75, id. at 1565, where the court noted that pilots must rely on visual data at decision height. This switch from instrument to visual orientation is precisely what contributes to spatial disorientation. These inconsistencies reinforce our impression of clear error. See Anderson v. City of Bessemer, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)
 
 
 [6]
 In a footnote, the district court observed that the parties did not try the case under a comparative negligence theory as such. Worthington, 807 F.Supp. at 1566 n. 24. Both parties maintained throughout litigation that the other's liability was the sole proximate cause of the crash. Id. Plaintiff argues that she filed a pre-trial memorandum containing argument and case law on comparative negligence. RV4-64. Having confirmed this assertion, and recognizing that this was a bench trial, we find that plaintiff properly raised the issue. It was also argued during closing arguments
 
 
 [7]
 Black's Law Dictionary 820 (6th ed. 1991) defines "intervening cause" as:
 an independent cause which intervenes between the original wrongful act or omission and the injury, turns aside the natural sequence of events, and produces a result which would not otherwise have followed and which could not have been reasonably anticipated.... An act of an independent agency which destroys the causal connection between the negligent act of the defendant and the wrongful injury.
 An "intervening efficient cause" is "a new and independent force which breaks the causal connection between the original wrong and injury, and itself becomes direct and immediate cause of injury." Id. See Ed Ricke & Sons, Inc., v. Green, 609 So.2d 504, 512 n. 6 (Kogan, J., concurring in result only).
 A "superseding cause" is "[a]n act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." Black's Law Dictionary 1438.
 
 
 [8]
 Decedent's confusion was like the tortfeasor driver's in Salas, where the Florida Supreme Court found that an accident occurring after an absence of information was "easily foreseeable." Salas, 511 So.2d at 547