[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 97-4956

_____

D. C. Docket No. 92-340-CV-EBD

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
09/10/98
THOMAS  K. KAHN
CLERK

AMERICAN DREDGING COMPANY,
as owner of the tug Marco Island
her engines, tackle,

                    Plaintiff-Counter-Claimant-Appellant,

          versus

JOSE LAMBERT,

                    Claimant-Counter-Defendant-Appellee,

MARIO PEREZ, as Personal
Representative of the Estate
of Vivian Perez, OLGA PEREZ,
VIVIAN PEREZ,

                    Claimants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(September 10, 1998)**

Before HATCHETT, Chief Judge, BLACK, Circuit Judge, and KRAVITCH,
     Senior Circuit Judge.

BLACK, Circuit Judge:

A pleasure boat carrying four passengers collided with a floating dredgepipe for which Appellant American Dredging Company, Inc. (American Dredging) was responsible. Following a bench trial, the district court found American Dredging liable to the parents and estates of two individuals killed in the accident. American Dredging filed this appeal.

I. BACKGROUND

On November 23, 1991, Donald Pietruszka, Vivian Perez, and Juan Renteria went to a nightclub in Miami Beach, Florida. Around 2:15 a.m., they met up with Alejandro Lambert. Shortly thereafter, the four of them left and took a ride in a pleasure boat operated by Lambert. After riding around for a while, Lambert piloted the boat towards Fisherman's Channel, a navigable channel located on the south side of Dodge and Lummus Islands.

That night, American Dredging was conducting a dredging operation in Fisherman's Channel to deepen the waterway. Some five or six vessels, including a dredge boat, a work boat, and three or four tugs, were working in the channel. Shortly before Lambert navigated the boat into Fisherman's Channel, a large barge and tug sought access to a dock at the Port of Miami. The dredge boat and the pipeline were blocking the dock. To permit access, one of the tugs, the *Marco Island*, opened the pipeline and moved a portion of it into Fisherman's Channel, causing the dredgepipe

2

effectively to block at least 70 percent of the navigable width of the channel. The pipeline was dark rust colored with no reflective tape or paint on it, and it was half-submerged in the water. The pipeline was supported on the water by floating orange trestles, but, at the time of the accident, was not lit for 300 feet in one direction and at least 100 feet in the other direction.

When Lambert entered Fisherman's Channel, he was operating the boat at a speed of approximately 30 mph. When the pleasure boat approached the pipeline, a deckhand on the *Marco Island* waived at the boat. Lambert maintained the boat's course and the boat collided with the dredgepipe. All four occupants were ejected from the boat upon impact. All died except Renteria.

American Dredging filed a petition for exoneration from or limitation of liability. Several parties contested American Dredging's right to exoneration from or limitation of liability and asserted claims under Florida and federal maritime law against American Dredging, seeking damages resulting from American Dredging's negligent operation of its vessels and equipment. On cross motions for summary judgment, the district court held that American Dredging's negligence precluded both exoneration from and limitation of liability and that the decedents' representatives potentially could recover non-pecuniary damages in the wrongful death suit. This Court affirmed. *See American Dredging Co. v. Lambert*, 81 F.3d 127, 130-31 (11th

3

Cir. 1996). On remand, the district court held a bench trial to determine (1) whether Lambert was comparatively negligent in his operation of the vessel and (2) what amount of damages would reasonably compensate the survivors of Lambert and Perez.[1]

At trial, American Dredging tried to establish Lambert's comparative negligence by arguing that Lambert violated statutory rules intended to prevent collisions. Specifically, American Dredging attempted to prove that Lambert violated the law by being legally intoxicated, failing to operate the boat at a safe speed, and failing to maintain a proper lookout. The district court rejected American Dredging's statutory violation theories and further concluded that Lambert was not comparatively negligent because the pipe could not have been seen in time to avoid the accident.[2] In its final judgment, the district court awarded damages for past and future emotional pain and suffering to Lambert's and Perez's parents.[3] The district court further awarded

---

[1] Renteria and Pietruszka's personal representative and survivors resolved their claims with American Dredging prior to trial.

[2] American Dredging asserts that the district court did not conclude that Lambert was not intoxicated at the time of the accident. We disagree. The toxicology report was the primary evidence relied on by American Dredging to establish Lambert's intoxication on the night of the accident. The district court expressly ruled that the toxicology report was unreliable and that the alcohol concentrations indicated in the toxicology report did not accurately reflect Lambert's blood-alcohol level at the time of the accident. (District Court Order at ¶¶ 11, 16)

[3] Specifically, the district court awarded  $300,000 to Lambert's mother, $300,000 to Lambert's father, $300,000 to Perez's mother, and $300,000 to Perez's father for past emotional pain and suffering and $200,000 to Lambert's mother , $150,000 to Lambert's father, $200,000 to Perez's

prejudgment interest on the damage awards for past emotional pain and suffering from the date of death to the date of the judgment.

## III. ANALYSIS

American Dredging argues that the district court erred by: (1) holding that Lambert was not comparatively negligent; (2) awarding damages for emotional pain and suffering to the surviving parents of Lambert and Perez (Claimants) even though they were not dependent on their deceased children; and (3) awarding prejudgment interest on the damages for past emotional pain and suffering from the date of death to the date of the district court's judgment.

## A. Standard of Review

In an action tried without a jury, the district court's findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed. R. Civ. P. 52(a). We will not hold a factual finding to be clearly erroneous unless "after assessing the evidence, [we are] left with a definite and firm conviction that a mistake has been committed." *Worthington v. United States*, 21 F.3d 399, 400 (11th Cir. 1994) (internal quotations and citations omitted). We review the district court's findings on

---

mother, and $150,000 to Perez's father for future emotional pain and suffering. The district court also awarded $4,066 and $2,581 for funeral expenses to the estates of Lambert and Perez, respectively.

5

the question of proximate cause and on the ultimate question of negligence under the clearly erroneous standard. *Id.* We review the district court's conclusions of law de novo. *Id.*

B.     Comparative Negligence

American Dredging contests the district court's conclusion that Lambert was not comparatively negligent. More specifically, American Dredging argues that the evidence clearly showed that Lambert violated three statutes designed to avoid precisely the type of accident that occurred in this case[4] and that, under federal maritime law, the burden shifted to Claimants to prove that Lambert's statutory violations could not have been a cause of the collision.[5] Claimants respond that the evidence supports the district court's findings that Lambert did not violate any of the statutory rules relied upon by American Dredging. We agree with Claimants. The district court's conclusions that Lambert was not legally intoxicated, not operating at an unsafe speed, and not failing to keep a proper lookout are not clearly erroneous.

---

[4] American Dredging relies upon: (1) Fla. Stat. ch. 327.35 and ch. 327.351 (prohibiting the operation of a vessel on the waters of Florida while under the influence of alcohol) (ch. 327.351 was repealed in 1996); (2) 33 U.S.C. § 2006 (requiring vessels to proceed at a safe speed for "the prevailing circumstances and conditions"); and (3) 33 U.S.C. § 2005 (requiring vessels to maintain a proper look-out).

[5] *See, e.g., Self v. Great Lakes Dredge & Dock Co.*, 832 F.2d 1540, 1554-55 (11th Cir. 1987) (discussing application of the rule set out in *The Pennsylvania*, 86 U.S. (Wall.) 125 (1874), that "when a ship involved in a collision is in violation of a statutory rule designed to prevent collisions, the burden shifts to that ship to disprove that the violation was a contributing cause of the collision").

6

Furthermore, the district court's ultimate conclusion that Lambert was not comparatively negligent is not clearly erroneous.

    1.    <u>Intoxication</u>.

At trial, the parties presented conflicting scientific evidence on the issue of Lambert's alleged intoxication at the time of the accident. Lambert's body was in the sea water for between 56 and 59 hours after the accident. It was not until about 78 hours after the accident that forensic studies were conducted using samples of Lambert's chest fluid and bile. The test results indicated that Lambert had a blood alcohol level of .22. To rebut the blood alcohol level test results, Claimants presented expert testimony from Dr. Richard Jensen that chest fluid and bile are terrible samples to analyze for alcohol content because they can contain contaminants. Dr. Jensen further testified about studies in which decomposition alone accounted for blood alcohol readings as high as .20.[6] Dr. Jensen explained the .22 blood alcohol test result in this case as "a result of either one or a combination of the processes that we have talked about; that is, either post mortem decomposition or post mortem diffusion of alcohol, if indeed, [Lambert] consumed just priority [sic] getting on the craft." Although American Dredging's experts disputed the degree to which the factors

_____

    [6] There also was evidence at trial pertaining to studies in which a blood alcohol reading as high as .22 resulted from decomposition.

identified by Dr. Jensen could skew the test results, they acknowledged that the factors could have some effect.[7]

The eyewitness testimony on the issue of Lambert's alleged intoxication is virtually uniform in its support for the conclusion that Lambert was not intoxicated at the time of the accident. Peter Ghaleb, a close friend of Lambert since the third grade, testified that he had seen Lambert intoxicated on prior occasions and therefore knew the symptoms Lambert exhibited when intoxicated, including slurred speech, red eyes, and stumbling. Ghaleb testified that he saw Lambert at a friend's birthday party around midnight on the night of the accident. Ghaleb testified that he did not see Lambert drink any alcoholic beverages at the party and that Lambert did not display any signs of intoxication that night.

Renteria, the sole survivor of the accident, also testified that Lambert did not exhibit any signs of intoxication on the night of the accident. Renteria said that Lambert did not slur his words, have bloodshot eyes, or have any trouble walking.

---

[7] Dr. William L. Hearn, the director of the Dade County Medical Examiner Department's toxicology laboratory and the individual who prepared the toxicology report in this case, testified that Lambert's actual blood alcohol level was probably about .20 to .21 to account for testing chest fluid instead of whole blood. Another American Dredging expert, Dr. John D. Charlesworth, testified that at the time he performed the autopsy, there was evidence of decomposition in Lambert's body. Dr. Charlesworth further testified that ethyl alcohol, the type of alcohol for which the toxicology laboratory tested, is produced by decomposition where certain microbiological organisms are involved, but stated that he could not be sure if such decomposition had occurred in this case. Dr. Charlesworth surmised that decomposition could inflate a blood alcohol reading by as much as .05.

Renteria did testify that Lambert ordered one beer at the nightclub, but said that Lambert did not finish it. He further testified that Lambert neither operated the boat erratically nor acted in any other way so as to create any cause for concern as to his ability to operate the boat.

2.    Excessive Speed.

Lieutenant Eugene Morgan, the Marine Patrol officer who authored the Marine Patrol investigative report on the accident, testified that 30 mph was an unsafe speed because of the work going on and the number of boats in Fisherman's Channel.[8] However, Lieutenant Morgan also testified that had there been no obstruction, or had the vessels been lit properly, there would have been nothing wrong with going 30 mph in the channel. Lieutenant Morgan further testified that the chief causes of the accident were the dredgepipe blocking the waterway and the lack of lights.

3.    Proper Lookout.

Renteria testified that Lambert faced forward and looked straight ahead while operating the boat. He also testified that Lambert had no problems negotiating the boat down a canal to an island and under two bridges before entering the channel where the collision occurred. Lieutenant Morgan's investigation also shows that

---

[8] Lieutenant Morgan's report identified four factors that contributed to the accident: (1) the presumed impaired condition of Lambert (due to the .22 blood alcohol test result); (2) the speed of the pleasure boat; (3) the lack of required lights on the pipeline; and (4) the interference to navigation caused by the pipeline extending into the channel.

9

Lambert operated the boat in other areas with markers and properly lit obstructions without problems.

American Dredging relies primarily on statements made by Renteria four days after the accident and at trial that he observed the dredgepipe three to four seconds before impact, which American Dredging argues would have given Lambert adequate time to avoid the collision had he been keeping a proper lookout. However, Renteria also testified at trial that he saw the dredgepipe less than a second before impact and that he could not differentiate with certainty between three and four seconds on the one hand and less than one second on the other.

Florida Marine Patrol Officer Vincent Peterson, the first police official to arrive at the scene of the accident, testified that he likely would have hit the dredgepipe as he approached the accident scene had a tug not shone its spotlight on the dredgepipe. Peterson testified that the dredgepipe effectively blocked the entire navigable width of Fisherman's Channel at the time of the accident and that the "channel seemed clear . . . until they hit the spotlight on the pipe."[9]

---

[9] In concluding that the dredgepipe was difficult to see, the district court also relied on a videotape of the scene taken shortly after the accident.

4.    Conclusion.

Based upon the evidence presented at trial, we hold that the district court's factual findings that Lambert did not violate the statutory rules relied upon by American Dredging are not clearly erroneous and therefore reject American Dredging's argument that the district court erred in failing to shift the burden of proof to Claimants to establish that Lambert was not comparatively negligent. Moreover, we hold that the evidence supports the district court's conclusion that Lambert was not comparatively negligent.

B.    Damages For Emotional Pain and Suffering

American Dredging argues that the district court's award of non-pecuniary damages to Claimants under the Florida Wrongful Death Act conflicts with the longstanding maritime rule that such damages are not available to non-dependent parents of adult children and that the award therefore should be vacated.

In American Dredging's first appeal, another panel of this Court concluded that Claimants could recover the non-pecuniary damages available under Florida law. *American Dredging*, 81 F.3d at 130-31. American Dredging has put forth no grounds on which we may reconsider that decision.

11

C.    <u>Prejudgment Interest on Damages For Past Emotional Pain and Suffering</u>

American Dredging contends that the district court erred by ordering it to pay prejudgment interest to Claimants on the damage awards for past emotional pain and suffering.  We agree.

Because Florida law provides the basis for recovery of damages for emotional pain and suffering, Florida law must be applied to determine whether the prejudgment interest award is proper.  *Cf. Royster Co. v. Union Carbide Corp.*, 737 F.2d 941, 948 (11th Cir. 1984) ("In a diversity case we follow the state law governing the award of interest."  (citation omitted)).

Under Florida law, "a claim becomes liquidated and susceptible of prejudgment interest when a verdict has the effect of fixing damages as of a prior date."  *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So.2d 212, 214 (Fla. 1985); *see also Alvarado v. Rice*, 614 So.2d 498, 499 (Fla. 1993) ("a plaintiff is entitled to prejudgment interest when it is determined that the plaintiff has suffered an actual, out-of-pocket loss at some date prior to the entry of judgment").  "Personal injury plaintiffs are generally not entitled to prejudgment interest because the damages are uncertain and are not liquidated until determined by the jury."  *Griefer v. DiPietro*, 708 So.2d 666, 673 (Fla. Dist. Ct. App. 1998); *see also Lumbermens Mut. Cas. Co. v. Percefull*, 653 So.2d 389, 390 (Fla. 1995) ("[T]ort claims are generally excepted from the rule allowing

12

prejudgment interest, primarily because tort damages are generally too speculative to liquidate before final judgment."); *Argonaut Ins. Co.*, 474 So.2d at 214 n.1 ("We are mindful that this Court has ruled that prejudgment interest is not recoverable on awards for personal injury." (citations omitted)).

Claimants in this case are analogous to personal injury plaintiffs – their damages were uncertain and unliquidated until determined by the district court. The district court divided the awards for emotional pain and suffering into two categories – one for past emotional pain and suffering and one for future emotional pain and suffering. This division demonstrates that damages for emotional pain and suffering compensate for injury suffered over time, not injury suffered as of a certain date. We therefore hold that the district erred in awarding prejudgment interest on the damage awards for past emotional pain and suffering.

## III.  CONCLUSION

We affirm the district court's conclusion that Lambert was not comparatively negligent and the district court's award of damages to Claimants for emotional pain and suffering. We reverse and vacate the award of prejudgment interest on the damage awards for past emotional pain and suffering.

AFFIRMED IN PART, REVERSED IN PART, AND VACATED IN PART.

13