In re: CONTAINER APPLICATIONS INTERNATIONAL, INC., Debtor.

Container Applications International, Inc., Plaintiff-Appellant,

v.

Lykes Bros. Steamship Co., Inc., Defendant-Appellee.

No. 00-11565.

United States Court of Appeals,

Eleventh Circuit.

Nov. 22, 2000.

Appeal from the United States District Court for the Middle District of Florida.(No. 97-01680-CV-T-25A), Henry Lee Adams, Jr., Judge.

Before CARNES and BARKETT, Circuit Judges, and POLLAK[*], District Judge.

BARKETT, Circuit Judge:

Container Applications International, Inc. ("CAI") appeals from a summary judgment granted by the

bankruptcy court, and affirmed by the district court, in favor of Lykes Bros. Steamship Co., Inc. ("Lykes")

disallowing maritime liens asserted by CAI against vessels owned by Lykes, pursuant to the Federal Maritime

Lien Act, 46 U.S.C. § 31341 *et seq.* (the "FMLA").  We affirm.

BACKGROUND

The relevant facts are undisputed.  CAI leases and sells cargo containers that are used by

transportation companies to transport goods, and Lykes is a shipping company providing cargo service

throughout the world.  In February 1993, CAI and Lykes entered into an agreement whereby CAI would lease

cargo containers in bulk to Lykes for use in its shipping business.  The lease agreement provided that the

leased containers would be used only on vessels owned and/or operated by Lykes and would be used for

oceanic transportation of goods and land transport in connection with the oceanic transportation.

From time to time Lykes picked up containers leased from CAI at locations throughout the world.

No container was delivered directly to any of Lykes' vessels, nor did any of the lease documents "earmark"

containers to any one vessel or otherwise make reference to any vessel.  While the lease required Lykes to

maintain tracking reports showing exactly which containers were used on which vessels and for how many

days, neither Lykes nor CAI knew at the time of commencement of the lease on which vessels the containers

[*]Honorable Louis H. Pollak, U.S. District Judge for the Eastern District of Pennsylvania, sitting by designation.

would be used and Lykes, in its complete discretion, determined upon which vessels or vehicles to place the containers.

Lykes filed a petition for bankruptcy in October 1995. At the time of filing, it owed CAI a substantial amount for outstanding rental fees on the leased containers. In the bankruptcy court, CAI asserted maritime liens[1] against various vessels owned by Lykes based upon each vessel's usage of CAI's containers. In defending against the liens, Lykes argued that maritime liens can be asserted under the FMLA only when the containers are either provided directly to or are earmarked for specific vessels and cannot be claimed for containers furnished in bulk to fleet owners who then decide upon which ships the containers will be placed. The bankruptcy court agreed with Lykes and disallowed CAI's liens on the vessels. The district court affirmed, and CAI now appeals. We review the bankruptcy and district court's conclusions of law *de novo*. *See American Dredging Co. v. Lambert,* 153 F.3d 1292, 1295 (11th Cir.1998).

DISCUSSION

CAI asserts its maritime liens pursuant to the FMLA, which provides in relevant part:

(a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—

(1) has a maritime lien on the vessel;

(2) may bring a civil action in rem to enforce the lien;  and

(3) is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342(a).[2]

The parties do not dispute that containers are "necessaries"[3] or that Lykes owned the vessels in question and ordered the containers. The sole issue for our determination is whether CAI "provided" the

---

[1]"A maritime lien is '[a] special property right in a ship given to a creditor by law as security for a debt or claim subsisting from the moment the debt arises[.]' " *Galehead, Inc. v. M/V Anglia,* 183 F.3d 1242, 1247 (11th Cir.1999) (citing *Black's Law Dictionary* 969 (6th ed.1990)).

[2]In 1989, 46 U.S.C. § 31342 superseded 46 U.S.C. § 971 without significant change. Section 971 had used the verb "furnishing" rather than "providing." Cases discussed herein that arose before 1989 discuss Section 971, but neither the parties nor earlier case law suggests that the word change is significant to the issue in this case.

[3]The term "necessaries" "has been liberally construed to include ... 'goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function. Necessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged.' " *Bradford Marine, Inc. v. M/V Sea Falcon,* 64 F.3d 585, 589 (11th Cir.1995) (quoting *Equilease Corp. v. M/V Sampson,* 793 F.2d 598, 603 (5th Cir.) (en banc), *cert. denied,* 479 U.S. 984, 107 S.Ct. 570, 93 L.Ed.2d 575 (1986)).

containers to the vessels within the meaning of the statute when it leased the containers in bulk to Lykes without reference to any vessels.

The seminal Supreme Court case on this question is *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.,* 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920). In *Piedmont,* a coal dealer supplied coal to an oil company for use at its oil refineries and on its fleet of fishing vessels. The coal was not designated "for any particular vessel or even for the vessels then comprising the fleet." *Id.* at 13, 41 S.Ct. 1. Rather, the coal was placed in bins at the oil company's factory where it was intermingled with other coal purchased by the oil company and then at various times used on the oil company's ships. The coal was billed to the oil company, the invoices did not reference the vessels, and the oil company controlled the distribution of the coal to its vessels. *Id.* at 7-8, 41 S.Ct. 1. As in this case, the question in *Piedmont* was whether, under the facts of the case, the coal was "furnished" or provided to the vessels by the party seeking the lien, pursuant to the meaning of the FMLA.[4] The Court disallowed the lien, holding that the coal had not been provided to the vessels by the coal company asserting the lien, but rather by the oil company to whom the coal had been sold.

Four other circuits have subsequently applied *Piedmont* to the specific situation before us, that is, to the lease of containers in bulk to a shipping company which decides when, where, and how it will use the containers within its fleet of ships. All four circuits have held that under such circumstances the supplier has not "provided" necessaries to the vessel within the meaning of the FMLA. *See Silver Star Enterprises, Inc. v. Saramacca MV,* 82 F.3d 666 (5th Cir.1996); *Redcliffe Americas Ltd. v. M/V Tyson Lykes,* 996 F.2d 47 (4th Cir.1993); *Itel Containers Int'l. Corp. v. Atlanttrafik Express Service, Ltd.,* 982 F.2d 765 (2d Cir.1992); *Foss Launch & Tug Co. v. Char Ching Shipping U.S.A.,* 808 F.2d 697 (9th Cir.1987), *cert denied,* 484 U.S. 828, 108 S.Ct. 96, 98 L.Ed.2d 57 (1987).

Moreover, numerous other courts have cited to *Piedmont* for the proposition that the term "providing necessaries to a vessel" in the FMLA requires that there be a direct connection between the provider of necessaries and a specific vessel. *See e.g., Jeffrey v. Henderson Bros., Inc.,* 193 F.2d 589, 593-94 (4th Cir.1951) (recognizing a lien where merchandise used to repair machinery for cleaning coal was supplied to a single vessel and the invoices asserted that the goods were intended for this operation); *The Everosa;*

---

[4]*See supra* footnote 1 (46 U.S.C. § 31342 superseded 46 U.S.C. § 971 replacing the term "furnishing" with the term "providing").

*Southern Coal and Coke Co. v. Kugniecibas,* 93 F.2d 732, 734-35 (1st Cir.1937) (recognizing a lien and distinguishing *Piedmont* based on the fact that the coal "was sent to a particular vessel, loaded on her by the coal company's representative and paid for by her master by drafts on the charterer to order of the coal company"); *Bankers Trust Co. v. Hudson River Day Line,* 93 F.2d 457, 458 (2d Cir.1937) (denying maritime liens to a supplier of oil and holding that necessaries, though delivered in mass to the owner of the fleet under a single contract, must be expressly ordered for the use of named vessels in specified portions); *Carr v. George E. Warren Corp.,* 2 F.2d 333, 334 (4th Cir.1924) (recognizing a lien and distinguishing *Piedmont* based on the fact that "85 percent of the coal was sold directly for use of the steamers named, and so billed to the vessels, and received and used by them"); *Christiana Marine Service Corp. v. THE HERCULES,* 1991 AMC 1274 (E.D.Pa.1990) (recognizing a towing company's lien where all towing services were provided to a single vessel and the invoice reflected that all services were to be provided to that vessel); *Northern Shipping Co. v. M/V Tivat,* 1988 AMC 1468 (E.D.Pa.1987) (noting that in *Piedmont* there was no "attempt to designate the particular vessel to receive any portion or component of the goods" and recognizing a lien where stevedoring, berthing and wharfage services were "furnished" directly to the vessel); *Atlantic Steamer Supply Co. v. The SS Tradewind,* 153 F.Supp. 354, 363-64 (D.Md.1957) (recognizing a lien where advertisement was furnished to a vessel and citing *Piedmont* for the proposition that "necessaries are furnished to the vessel only when they are ordered for a particular vessel and thereafter are either actually put on board or brought within the control of the ship's officers is settled law"); *The American Eagle,* 30 F.2d 293, 295 (D.Del.1929) (holding that a coal supplier "furnishes" coal to vessels if "the supplies, though delivered in mass to the owner of the fleet under a single contract, are expressly ordered by the owner and delivered to him by the supplyman for the use of named vessels in specified portions, and are promptly delivered to the named vessels by their owner").

However, two district courts in the Eleventh Circuit have rejected a restrictive reading of the FMLA's requirements for the creation of a maritime lien.[5] In *Transamerica ICS, Inc. v. M/V Panatlantic,* 1984 AMC

---

[5]Other courts, including one circuit court, that have been critical of a restrictive reading of the FMLA's requirements for the creation of a maritime lien have been overruled to the extent that those courts suggest that earmarking necessaries is not a prerequisite to creation of a maritime lien. *Compare Equilease Corp. v. M/V Sampson,* 793 F.2d 598, 603 (5th Cir.1986) (rejecting a literal interpretation of "furnishing" and holding that the FMLA does not require actual delivery of necessaries to a vessel), *with Silver Star Enters., Inc. v. Saramacca MV,* 82 F.3d 666, 669-70 (5th Cir.1996) (distinguishing *Equilease* and holding that maritime lien was not available where containers were leased in bulk and not earmarked), *and Orbis Marine Enterprises, Inc. v. TEC Marine Lines, Ltd.,* 692 F.Supp. 280, 283-84 (S.D.N.Y.1988) (holding that earmarking is not a prerequisite to the creation of a maritime lien) *with Itel*

489 (S.D.Fla.1983), the district court suggested that "it may not be essential, and indeed may not be desirable, that the container ... be earmarked for a particular vessel." *Id.* at 490. Similarly, the court in *Triton Container International Limited v. M/S ITAPAGE,* 774 F.Supp. 1349 (M.D.Fla.1990), relying on *Transamerica,* held that "it is not necessary that a container be identified with a particular vessel." *Id.* at 1350-51.

CAI argues that we should follow *Transamerica* and disregard the cases from our sister circuits, arguing that these circuits have erroneously interpreted *Piedmont* to hold that pre-delivery earmarking of supplies for a specific vessel is a prerequisite to a maritime lien. CAI argues that not only do these cases erroneously interpret *Piedmont,* but that their holdings are in conflict with *Piedmont.* CAI suggests that two factors were critical to the Court's decision in *Piedmont,* both of which distinguish it from the case at hand. First, because the coal had been co-mingled with coal from other sources in *Piedmont,* it was impossible to determine whether the coal ultimately delivered to the vessels was the same coal for which the debt was owed. In contrast, CAI argues, it is undisputed that the containers used on Lykes' vessels actually belonged to CAI. Second, the coal furnished to the vessels was coal to which the oil corporation had acquired title. As a result, the coal dealer lost control to determine how the coal would be used. In this case, Lykes merely leased the containers and, under the lease agreement, Lykes did not have unfettered discretion to use the containers as it saw fit because the lease limited their use to Lykes' vessels and only for the purpose of "oceanic transportation of goods and ... land transportation incidental thereto." CAI argues that in light of these distinctions, *Piedmont* does not dictate the result in this case.

We find that CAI reads *Piedmont* much too narrowly and that these distinctions are insignificant to the Supreme Court's rationale and to its holding. The fact that the coal had been co-mingled or that the oil company had obtained sole title to the coal was not a dispositive factor in the court's decision. Rather, in interpreting the FMLA, the Court focused on whether there was a direct connection between the provider or furnisher of the necessaries and the vessel itself.

The Court expressly noted that "the difficulty here is not in failure to show that the coal was furnished to the vessels but in failure to prove that it was furnished by the libelant." 254 U.S. at 5, 41 S.Ct. 1. In

*Containers Int'l. Corp. v. Atlanttrafik Express Service, Ltd.,* 982 F.2d 765, 768 (2d Cir.1992) (holding that a lease of containers to a fleet of vessels did not create a maritime lien on those vessels). *See also, Redcliffe Americas, Ltd. v. M/V Tyson Lykes,* 806 F.Supp. 69 (D.S.C.1992), *rev'd* 996 F.2d 47 (4th Cir.1993) (district court holding that earmarking is not a prerequisite to the creation of a maritime lien and finding that the maritime lien extended to containers leased in bulk to a fleet owner reversed by the Fourth Circuit).

*Piedmont,* the coal was sold in bulk to the oil company without any reference to a specific vessel. In this case, CAI likewise leased the containers in bulk to Lykes without any reference to any specific vessel. In both cases, the supplier had no choice in determining which, if any, vessels would use their product. Thus, no direct connection existed between CAI, which furnished the containers, and any of the ships upon which Lykes ultimately placed the containers.

As was the Ninth Circuit in *Foss Launch,* we are persuaded that the universal application of *Piedmont* to require a narrow construction of the term "providing" is further supported by *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.,* 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197 (1940). *See Foss Launch,* 808 F.2d at 701-02. In that case, the Supreme Court affirmed a maritime lien in favor of an oil supplier only after it had distinguished *Piedmont:*

> The difficulty which blocked recovery by the Coal Company [in *Piedmont* ] was "solely that it did not furnish coal to the vessels". There "was no understanding when the contract was made, or when the coal was delivered by the libelant, that any part of it was for any particular vessel or even for the vessels then composing the fleet. And it was clearly understood that the purchasing corporation would apply part of the coal to a nonmaritime use". In the instant case, the oil was supplied exclusively for the vessels in question, was delivered directly to the vessels and was so invoiced; and there was nothing in the general contract to the effect that the supplies were to be furnished upon the exclusive credit of [the vessel's owner] and not also upon the credit of the vessels.

Id. at 276-77, 41 S.Ct. 1 (internal citations omitted).

The Court in *Piedmont* read the relevant provision in the FMLA narrowly, holding that the coal company had failed to prove that it "furnished" the coal to the ships upon which it seeks a lien. *Id.* at 4, 41 S.Ct. 1 ("the difficulty facing the Coal Company [in *Piedmont* ] was solely that it did not furnish coal to the vessels upon which it asserts a maritime lien, and there is nothing in the Act ... which removes that obstacle"). The Court was urged, as are we, to interpret the relevant provision of the FMLA in a more expansive and liberal manner to permit the lien. However, the Court recognized that maritime liens are disfavored in the law because they are secret ones that might operate to the prejudice of prior mortgagees or of purchasers without notice, and held that the FMLA "is therefore stricti juris and will not be extended by construction, analogy or inference." *Id.*

CAI argues, however, that our precedent requires that we interpret all provisions of the FMLA liberally, relying on *Atlantic & Gulf Stevedores v. M/V Grand Loyalty,* 608 F.2d 197 (5th Cir.1979).[6] CAI

---

[6]In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc* ), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

suggests that in *Grand Loyalty* the former Fifth Circuit held that the FMLA should be interpreted broadly to permit the liens asserted by CAI. We do not find this to be the holding in *Grand Loyalty* and we do not find *Grand Loyalty* applicable to these circumstances. *Stricti juris* is a rule of construction employed in certain instances to discern legislative intent in an ambiguous provision. Rather than rejecting the view that maritime liens are subject to the doctrine of *stricti juris,* the court expressly noted that "[i]t is, of course, nigh onto hornbook law that maritime liens are to be strictly construed." *Id.* at 200-01. *Grand Loyalty* simply held that it was unnecessary to apply this rule of construction because it was clear that Congress intended, through the 1971 amendments, to make it easier and more certain for stevedores performing traditional services to be protected.

More importantly, *Grand Loyalty* did not involve an interpretation of the very same provision that the Supreme Court construed narrowly under the doctrine of *stricti juris.* The court in *Grand Loyalty* was interpreting the meaning of certain provisions of sections 971 and 972 in light of the new 1971 amendments. *Id.* at 200 ("We, perforce, must focus on the meaning of 'any person to whom management of the vessel at the port of supply is intrusted,' § 972; 'person authorized by the owner,' § 971; and 'other necessaries', §§ 971 and 972"). In light of the specific directive of the Supreme Court as it relates to the very same provision at issue here, we reject CAI's contention that the rule of *stricti juris* does not govern this provision of the FMLA and that we should liberally construe it to permit CAI's lien.

Thus, we agree with our sister circuits and hold that, under the dictates of *Piedmont,* cargo containers leased in bulk to the owner of a group of vessels for unrestricted use on board the vessels in that group, are not "provided" to any particular vessel within the meaning of 46 U.S.C. § 31342(a). In this case, CAI neither physically delivered the containers to the vessels nor did it direct Lykes to distribute the containers to particular vessels. CAI merely made containers available to Lykes for its use, and Lykes had sole discretion to decide whether to place any of the containers on board any particular vessel. Thus, CAI did not "provide" necessaries to the liened vessels within the meaning of the FMLA. For all of the foregoing reasons, the order of the district court, disallowing the maritime liens asserted by CAI against Lykes, is

AFFIRMED.

POLLAK, District Judge, concurring.

I concur in the judgment of the court, and I join its opinion. I add a brief word to make a rather simple point.

The court finds that the Supreme Court's opinion of eighty years ago, in *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.,* 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920), remains the authoritative construction of the pertinent portion of the Federal Maritime Lien Act (FMLA). I agree. The *Piedmont* opinion was written by Justice Brandeis and the Supreme Court was unanimous. It would take a very strong showing that the Supreme Court has, in some subsequent case, undercut, or substantially limited, the *Piedmont* opinion, before any lower court could decline to follow it. But there is no evidence that the Supreme Court has weakened *Piedmont.* To the contrary, as the court today points out, the Supreme Court, in 1940, had occasion to refer to *Piedmont,* and did so in a way that evidenced *Piedmont*'s continuing vitality. In *Dampskibsselskabet v. Signal Oil Co.,* 310 U.S. 268, 276-77, 60 S.Ct. 937, 84 L.Ed. 1197 (1940), Chief Justice Hughes, speaking for the unanimous Court, distinguished *Piedmont* from the case then before the Court; but the discussion of *Piedmont* manifested unhesitating acceptance of the principles Justice Brandeis had announced twenty years before.

The only real question before this court today is whether the language of *Piedmont*—which dealt with supplying coal in bulk to a company that used some, but not all, of the coal on its fishing vessels—has valid application to the case at bar, which involves the leasing of cargo containers to a shipping company under an agreement which, as the court aptly summarizes it, "provided that the leased containers would be used only on vessels owned and/or operated by [the shipping company] and would be used for oceanic transportation of goods and land transport in connection with the oceanic transportation." Leasing cargo containers to a shipping company is not a unique, or even an unusual, transaction. As the court makes clear, essentially the same transaction has been considered, in the context of the FMLA, by four other courts of appeals, and all four were guided by *Piedmont* to the conclusion that no FMLA maritime lien had attached.

It may reasonably be asked whether the policy reasons that led the *Piedmont* Court to find, with respect to the somewhat clumsy transaction framed by the particular facts of that case, that there was no maritime lien—a lien of a sort that the Court deemed "secret" and that "may operate to the prejudice of prior mortgagees or of purchasers without notice," 254 U.S. at 12, 41 S.Ct. 1—are of comparable force in the context of the apparently mature system of large-scale leasing of cargo containers illustrated by the case at bar. But the answer to that question is not one that a court is likely to be in a position to make an informed judgment about on the basis of a record and briefs presented in litigation. It is the sort of question that members of Congress—after considering the testimony of those versed in shipping-industry practices and the

operation of the relevant credit structures—would be better equipped to answer than judges are.

Pending congressional review of the pertinent portion of FMLA, the course of judicial prudence is for this court—acknowledging that at least for the time being *Piedmont* provides doctrinal guidance—to align itself with the four courts of appeals that have already rejected the claim of a maritime lien in the context of leased cargo containers.