**Jeff SEXTON, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 99–102–CIV–ORL–3ABl(22).**

United States District Court,
M.D. Florida,
Orlando Division.

Dec. 18, 2000.

Eric H. Faddis, Faddis, Oldham & Smith, Orlando, FL.

Robert Henry, Ringer & Henry, P.A., Orlando, FL.

AUSA I. Randall Gold.

Catherine M. Maraist, Trial Attorney, Torts Branch, U.S. Department of Justice, Washington, DC.

R. Brooke Lewis, Office of Chief Counsel, Federal Aviation Administration, Washington, DC.

## MEMORANDUM OF DECISION

GLAZEBROOK, United States Magistrate Judge.

### I. INTRODUCTION

Plaintiff Jeffery Sexton seeks money damages from the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346, for the cost of repairing his "Steen Skybolt" ["Skybolt"], a small experimental two-seat aerobatic tail-wheel bi-plane. On Sunday, March 29, 1998, Sexton's Skybolt collided with another aircraft just south of the intersection of taxiway Lima and Runway 9 Right at Sanford Airport in Sanford, Florida. Sexton contends that the local controller negligently authorized the ground controller to permit Sexton to cross Runway 9 Right southbound on taxiway Lima without alerting the ground controller to a Cessna also on taxiway Lima. The local controller had directed the Cessna to hold short just south of Runway 9 Right on taxiway Lima, and the Cessna remained there on the local controller's radio frequency.

Sexton also contends that the ground controller negligently instructed Sexton to "cross runway niner right without delay" on taxiway Lima without telling Sexton that he would encounter a Cessna in front of him on the same taxiway on the other side of Runway 9 Right. According to Sexton, the Federal Aviation Administration [the "FAA" or the "government"] negligently failed to adequately staff the Sanford Air Traffic Control Tower in light of the volume of air traffic. Specifically, Sexton claims that the government was negligent in asking one local controller to man two local controller positions—and in asking one ground controller also to man the flight data and clearance delivery controller position—which under-staffing caused or contributed to the collision.

The government denies that the tower controllers breached any duty to Sexton, and denies that any act or omission by the tower controllers was a substantial factor in causing the collision. The government

denies that it is liable for negligent understaffing the control tower because sovereign immunity bars that claim. Instead, the government contends that the sole cause of the collision was Sexton's negligence in 1.) failing to maintain a proper lookout for the other aircraft; 2.) failing to operate his aircraft in a prudent and careful manner; and 3.) failing to refuse the ground controller's taxi instruction if he could not comply with it safely. The Court tried the case without a jury on November 6—7, 2000.

## II. THE LAW

### A. *Sovereign Immunity from Suit*

Under traditional principles of sovereign immunity, the United States is immune from suit except to the extent the government has waived its immunity. In 1946, Congress adopted the Federal Tort Claims Act ["FTCA"], 28 U.S.C. §§ 1346(b), 2671 *et seq.*, which, subject to numerous exceptions, waives the federal government's sovereign immunity for claims based on the negligence of its employees. The FTCA authorizes suits against the United States for damages:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). The FTCA further provides that the United States shall be liable with respect to tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

The FTCA, however, did not waive the sovereign immunity of the United States in all respects. Of particular relevance here, the United States has not waived its sovereign immunity from suit for the discretionary functions of its agencies and employees. 28 U.S.C. § 2680(a). The waiver of sovereign immunity found at § 1346(b) does not apply to:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to·exercise a discretionary function or duty on the part of a federal agency or an employee of the Government whether or not the discretion involved be abused.

28 U.S.C. § 2680(a); *accord, United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), and *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).

The discretionary function exception marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals. *Cohen v. United States*, 151 F.3d 1338, 1340 (11th Cir.1998). If the discretionary function exception applies, the court must dismiss the claim brought under the FTCA for lack of subject matter jurisdiction. *See Cohen*, 151 F.3d 1338, 1340 (characterizing sovereign immunity as an issue of subject matter jurisdiction); *Mid–South Holding Company, Inc. v. United States*, 225 F.3d 1201, 1207 (11th Cir.2000).[1]

Although a plaintiff bears the initial burden of proving subject matter juris-

---

1. The United States Court of Appeals for the Eleventh Circuit reviews issues concerning subject matter jurisdiction *de novo*. *See Bish-* *op v. Reno*, 210 F.3d 1295, 1298 (11th Cir. 2000).

diction under the FTCA, the burden of proving the applicability of the discretionary function exception (an affirmative defense) falls upon the United States. *National Union Fire Ins. v. United States,* 115 F.3d 1415 (9th Cir.1997). Courts apply a two-prong test to determine whether the discretionary function exception applies. First, the exception covers only acts that are discretionary in nature, *i.e.,* acts that involve an element of judgment or choice. *United States v. Gaubert,* 499 U.S. 315, 321, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (quoting *Berkovitz v. United States,* 486 U.S. at 536, 108 S.Ct. 1954). The exception will not apply when a federal statute, regulation, or policy specifically prescribes the course of action a government employee must follow. 151 F.3d at 1341.

Second, if the conduct in question involves judgment or choice, the court must also decide whether that judgment is of the kind that the discretionary function exception was designed to shield, *i.e.,* "grounded in social, economic and political policy." *Gaubert,* 499 U.S. at 322—23, 111 S.Ct. 1267 (quoting *Berkovitz v. United States,* 486 U.S. at 536, 108 S.Ct. 1954 and *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. at 814, 104 S.Ct. 2755). Once a governmental action has been found to be discretionary, and also has been found to be grounded in public policy, it is immaterial to an immunity analysis whether the action was negligently performed. *See Mid–South Holding Company,* 225 F.3d at 1207.

Precisely what conduct falls within the scope of the discretionary function exception remains unclear—despite an immense number of cases on the subject. Interpreting the discretionary function *too* broadly undermines Congress' rationale in enacting the FTCA—the government should be liable for conduct that would be tortious if committed by a private actor. *See Indian Towing Co. v. United States,* 350 U.S. 61, 68—69, 76 S.Ct. 122, 100

L.Ed. 48 (1955). Clearly, the discretionary function exception does not encompass every act of a government employee that involves some element of discretion.

This Court must be careful to avoid any interpretation of the discretionary function exception that would immunize every governmental act. Virtually every act of a government employee, even the most routine ministerial action by the lowest-level employee, involves some judgment or choice. *See, e.g., Coulthurst v. United States,* 214 F.3d 106 (2d Cir.2000). Even the most routine agency action may always be linked to some general policy regulation. *See, e.g., Andrulonis v. United States,* 952 F.2d 652, 655 (2d Cir.1991). Were the discretionary function exception to encompass all actions as to which the actor had some choice, it would fully eclipse the FTCA's general waiver of immunity. The courts must exercise restraint in insulating the government from nearly all tort liability, because to do so would frustrate Congress' purpose in enacting the FTCA. *See Coulthurst,* 214 F.3d at 110.

Determining whether the discretionary function exception applies to a particular decision requires the court to pinpoint the precise reach of the agency policy in question. For any official course of action, there comes a point at which the agency's policy choices—all protected by the discretionary function exception—remain to be executed by low-level officials through routine, implementing actions. It is clear that discretionary conduct is not confined to the policy or planning level. *Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267. The mere fact that a government official performs an action at the "operational level" (as opposed to the planning level) does not remove that official's actions from the discretionary function exception. *Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267; *Cohen,* 151 F.3d at 1342. Nevertheless, the distinction between immunized policy and non-immunized operational acts is not always clear.

■ It is the nature of the decision or conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.[2] The focus is not on the subjective intent of the government employee. *Cohen*, 151 F.3d at 1341. Nor is it on whether the employee actually weighed social, economic, and political policy considerations before acting. *Cohen*, 151 F.3d at 1341. Instead, the focus is on the "nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267; *Cohen*, 151 F.3d at 1341.[3]

■ A government actor's decision is shielded from liability by the discretionary function exception if the choice is, under the particular circumstances, one that ought to be informed by considerations of social, economic, or political policy, and is made by an officer whose official responsibilities include assessment of those considerations. *Gaubert*, 499 U.S. at 334—38, 111 S.Ct. 1267 (Scalia, J., concurring in result). Ordinarily, an employee working at the operational level is not responsible for policy decisions, even though policy considerations may be highly relevant to his actions.

For example, a dock foreman's decision to store bags of fertilizer in a highly compact (and ultimately a dangerous) fashion is not protected by the exception because,

even if he carefully calculated considerations of cost to the government versus safety, it was not his responsibility to ponder such things. The Secretary of Agriculture's decision to the same effect is protected, because weighing those considerations is his task. *Gaubert*, 499 U.S. at 335—36, 111 S.Ct. 1267 (Scalia, J., concurring in result). However, where the actions of government actors involving the necessary element of choice are grounded in the social, economic, or political goals of a statute or regulation, those actions are protected. *Gaubert*, 499 U.S. at 323, 111 S.Ct. 1267. Actions taken in furtherance of policy-grounded programs are likewise protected. *Gaubert*, 499 U.S. at 323, 111 S.Ct. 1267.[4]

■ When a regulatory scheme expressly or impliedly confers discretion upon a government official, a strong presumption arises that the government official's actions are grounded in public policy. *Cohen*, 151 F.3d at 1344 (quoting *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267). The presumption will be rebutted in many cases, however, because personnel perform many discretionary acts that involve a significant degree of choice, but which are not grounded in regulatory policy. *Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267. In determining whether the conduct questioned in a particular case sufficiently rebuts the presumption that it is grounded in public policy, the inquiry must focus on an objec-

---

**2.** Justice Scalia's concurring opinion in *Gaubert*, however, aptly points out that the status of the actor is not wholly irrelevant. Rather, the higher the actor stands in a particular agency, the stronger the presumption that he is afforded discretion to devise public policy. Conversely, the lower the status of the actor, the less likely it is that he is authorized to set policy and the more likely he is to be merely implementing the policy choices of others. *Gaubert*, 499 U.S. at 334—38, 111 S.Ct. 1267 (Scalia, J., concurring in result).

**3.** In *Cohen*, the Eleventh Circuit presumed that the Bureau of Prison's operational-level decisions on how to classify and lodge prisoners "are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's

prisons." 151 F.3d at 1344. The United States therefore was immune from suit by a prisoner who had been attacked by an allegedly mis-classified violent offender.

**4.** In *Gaubert*, the shareholder of an insolvent savings and loan association sought to hold the United States liable for the negligence of federal regulators in making specific day-to-day operational and management decisions. The Supreme Court presumed that the regulators chose to act in furtherance of governmental policies—protecting the solvency of the savings and loan industry, and preserving deposits for the benefit of depositors and shareholders. 499 U.S. at 332, 111 S.Ct. 1267. The United States was immune for these operational level discretionary acts. 499 U.S. at 332, 111 S.Ct. 1267.

tive evaluation of the discretion conferred, and not on the actor's subjective choice of a course of action.

The United States Court of Appeals for the Eleventh Circuit has taken *Gaubert* a step further, to the extent that the United States is immune from nearly every decision or choice made by a federal law enforcement officer during a drug search. In *Mid–South Holding Company*, a vessel sank after United States Customs Agents disconnected an electrical cord from the vessel's bilge pump while agents searched the vessel for drugs. *Mid–South Holding Company, Inc. v. United States*, 225 F.3d 1201 (11th Cir.2000) (action brought under the Suits in Admiralty Act). The Eleventh Circuit held that the United States was immune from liability for the Customs agent's allegedly negligent act of disconnecting the electrical cord because his act was "conceivably in furtherance of the search." 225 F.3d at 1207.

The United States Customs Service necessarily exercises discretion in choosing whether to board and search a vessel by weighing the costs of the search against the likelihood of enforcement success. Also, the on-site agents must balance their goal of locating contraband with concerns as to the efficiency of the search to minimize intrusion on privacy. 225 F.3d at 1207. According to the court of appeals, the on-site decision of the agent to disconnect the cord related to the manner in which to search the vessel, and therefore furthered the general policy decisions of the United States Customs Service. 225 F.3d at 1206.

The United States therefore may be immune from suit even for on-site operational acts that "could be characterized as mundane or as disengaged from any substantial policy consideration." 225 F.3d at 1207. The Eleventh Circuit cautioned that:

> [A]lmost any exercise of governmental discretion could be overly parsed so as to focus on minute details of sub-decisions to the point that any relationship to policy would appear too attenuated. But doing that obscures the very purpose of the discretionary function exception.... [S]uch tunnel-visioned analyses would render the discretionary function exception nugatory and open virtually every decision that implements a governmental decision to liability....

*Mid–South Holding Company*, 225 F.3d at 1207, citing *Baldassaro v. United States*, 64 F.3d 206, 211—12 (5th Cir.1995).

## B. *Florida Negligence Law*

■ Florida law applies to the present action because the incident occurred in Florida, and because the controllers and pilot involved were based in Sanford, Florida. *See* 28 U.S.C. § 1346(b); *accord, Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Under Florida law, the plaintiff must prove four elements to prevail on a negligence claim: 1.) the defendant owes a legal duty to the plaintiff; 2.) the defendant breached that duty; 3.) defendant's breach legally caused an injury to plaintiff; and 4.) damages resulted from the injury. *See Paterson v. Deeb*, 472 So.2d 1210, 1214 (Fla. 1st Dist. Ct.App.1985); *Miller v. Foster*, 686 So.2d 783, 784 (Fla. 4th Dist.Ct.App.1997); *Meyers v. City of Jacksonville*, 754 So.2d 198, 202 (Fla. 1st Dist.Ct.App.2000); *Lewis v. City of St. Petersburg*, 98 F.Supp.2d 1344, 1348 (M.D.Fla.2000).

■ In proving legal causation under Florida law, a plaintiff must show that the defendant's act or omission was both a cause in fact and a proximate cause of plaintiff's injury. *McCain v. Florida Power er Corp.*, 593 So.2d 500, 503 (Fla.1992); *Department of Transportation v. Anglin*, 502 So.2d 896, 898–900 (Fla.1987). To prove cause in fact, a plaintiff must establish that "but for" the defendant's act or omission, no injury would have occurred. *See Stahl v. Metropolitan Dade County*, 438 So.2d 14, 17–19 (Fla.3d Dist.Ct.App. 1983). To show that the injury sustained was proximately caused by a defendant's breach of duty, a plaintiff must show that

"prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *McCain*, 593 So.2d at 503; *see also Hitchcock v. F.S. Disposition, Inc.*, 704 So.2d 1118, 1120—21 (Fla.2d Dist.Ct.App.1998); *Coker v. Wal–Mart Stores, Inc.*, 642 So.2d 774, 776 (Fla.2d Dist.Ct.App.1994). The Court cannot find proximate causation by indulging in speculation or by impermissibly pyramiding inference on inference. *Gelco Convention Services v. Pettengill*, 710 So.2d 581, 584 (Fla. 4th Dist.Ct.App.), *review denied*, 718 So.2d 170 (Fla.1998).

■ Florida uses a "pure" comparative negligence rule. If both parties are at fault, the plaintiff's recovery is limited to the proportion of damages that defendant's negligence proximately caused. The United States Court of Appeals for the Eleventh Circuit has described Florida negligence principles as "tricky at best," especially where superseding intervening causes may be involved.[5] *Worthington v. United States*, 21 F.3d 399, 404 (11th Cir.1994).

The Florida Supreme Court has replaced the harsh contributory negligence rule with principles of comparative negligence. *Hoffman v. Jones*, 280 So.2d 431 (Fla.1973). Where both plaintiff and defendant are at fault, the trier of fact must apportion negligence between plaintiff and defendant, and award the plaintiff accordingly. 280 So.2d at 438. Under comparative negligence, a plaintiff is barred from recovering damages only when the plaintiff's negligence is the sole legal cause of the damage. *Worthington*, 21 F.3d at 404—05.

■ In *Gibson v. Avis Rent–A–Car System, Inc.*, 386 So.2d 520 (Fla.1980), the Florida Supreme Court analyzed an alleged "efficient intervening cause" under the comparative negligence scheme as a question of "responsibility," holding that if an intervening cause is foreseeable, the original negligent actor may still be held liable. 386 So.2d at 522. Foreseeability is a question of fact that may be tested by asking whether the harm that occurred was within the scope of the danger attributable to the defendant's negligent conduct. *Worthington*, 21 F.3d at 405. That analysis may be informed by the legislature, by the particular defendant's actual knowledge that the same type of harm has resulted in the past from the same type of negligent conduct, or by recognition that the type of harm in question has so frequently resulted from the same type of negligence that, in the field of human experience, the same type of result may be expected again. 386 So.2d at 522—23; *Worthington*, 21 F.3d at 405. A foreseeable result cannot be called an efficient intervening cause. 386 So.2d at 522—23; *Worthington*, 21 F.3d at 405.

An "independent, efficient, intervening cause," however, is one that breaks the chain of causation. *Department of Transportation v. Anglin*, 502 So.2d 896 (Fla. 1987) (Department of Transportation not liable for water in road that doused car engine given that second car intervened

---

5. Florida courts use the terms "superseding cause," "intervening cause," "superseding intervening cause," and "efficient intervening cause" to describe situations involving more than one negligent actor. BLACK's LAW DICTIONARY 820 (6th ed.1991) defines "intervening cause" as: an independent cause which intervenes between the original wrongful act or omission and the injury, turns aside the natural sequence of events, and produces a result which would not otherwise have followed and which could not have been reasonably anticipated. . . . An act of an independent agency which destroys the causal connection between the negligent act of the defendant and the

wrongful injury. An "intervening efficient cause" is "a new and independent force which breaks the causal connection between the original wrong and injury, and itself becomes direct and immediate cause of injury." *Id; Worthington*, 21 F.3d at 404, n. 7; *see also Ed Ricke & Sons, Inc., v. Green*, 609 So.2d 504, 512 n. 6 (Kogan, J., concurring in result only). A "superseding cause" is "[a]n act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." BLACK's LAW DICTIONARY at 1438; *Worthington*, 21 F.3d at 404. n. 7.

when it slammed into people pushing the water-stalled car). Florida courts are reluctant to find proximate cause, however, and to attach tort liability for results which—although caused-in-fact by the defendant's negligent act or omission—seem to be highly unusual, extraordinary, bizarre, or seem to be beyond the scope of any fair assessment of the danger created by the defendant's negligence. *Worthington*, 21 F.3d at 405; *Stahl v. Metropolitan Dade County*, 438 So.2d 14, 21 (Fla.Dist. Ct.App.1983).

In *Palm Beach County Bd. of County Comm'rs v. Salas*, 511 So.2d 544 (Fla. 1987), Palm Beach County had failed to properly separate motorists negotiating a hazardous work site. The Court reversed a directed verdict for the county, and remanded the case for consideration under appropriate comparative negligence principles, where a motorist's intervening actions were not so unforeseeable that the county should be relieved, as a matter of law and policy, of all liability:

> Blount's confusion at this busy and now more dangerous intersection was not some remote possibility, it was easily foreseeable. The fact that Blount was negligent when she turned left does not render her action so bizarre, unusual or outside the realm of the reasonably foreseeable that the county's actions did not also proximately cause the [plaintiffs'] injuries.

511 So.2d at 547; *accord, Worthington*, 21 F.3d at 406.

### C. *Pilots' Duties and Responsibilities*

Congress empowered the Administrator of the FAA to promote air commerce and aviation safety under the terms of the Federal Aviation Act of 1959 as amended, 49 U.S.C. §§ 1301 *et seq.* The Administrator promulgated Federal Aviation Regulations ["FARs"]. *See* 14 C.F.R. Chapter 1 *et seq.* The pilot in command of an aircraft is directly responsible for, and has final authority over, the safe operation of his aircraft. 14 C.F.R. § 91.3; *accord, Management Activities, Inc. v. United States*, 21 F.Supp.2d at 1175; *Webb v. United States*, 840 F.Supp. at 1511; *In re Air Crash at Dallas/Fort Worth Airport on August 2, 1985*, 720 F.Supp. 1258, 1279–80 (N.D.Tex. 1989); *Moorhead v. Mitsubishi Aircraft Int'l*, 828 F.2d 278, 285 (5th Cir.1987); *Spaulding v. United States*, 455 F.2d 222, 226 (9th Cir.1972).

■ Pilots must know the provisions of the Aeronautical Information Manual ["AIM"] and FAA Advisory Circulars ["AC's"] pertaining to their flying activities. 14 C.F.R. § 61.105. The Court may look to the AIM and AC's as evidence of the standard of care among pilots. *Management Activities, Inc. v. United States*, 21 F.Supp.2d at 1175; *Dyer v. United States*, 832 F.2d 1062, 1069 (9th Cir.1987); *First of America Bank–Cent v. United States*, 639 F.Supp. at 453; *Associated Aviation Underwriters v. United States*, 462 F.Supp. 674; *Thinguldstad v. United States*, 343 F.Supp. 551, 552–53 (S.D.Ohio 1972).

■ The AIM (effective February 26, 1998) defines air traffic control instructions as follows: "*Directives* issued by air traffic control for the purposes of *requiring* a pilot to take specific actions ..." AIM, Glossary at A–10 (emphasis supplied). The AIM further states:

> [I]t is important that pilots clearly understand the clearance or instruction. Although an ATC [Air Traffic Control] clearance is issued for taxiing purposes, when operating in accordance with the FAR's, it is the responsibility of the pilot to avoid collision with other aircraft. Since the "pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft" the pilot should obtain clarification of any clearance or instruction which is not understood.

AIM at paragraph 4–3–18. An air traffic control instruction does not relieve the pilot of the duty and responsibility to oper-

ate his aircraft in a manner consistent with the FARs and good operating practice. *Thurston v. United States,* 888 F.Supp. at 1109; *see also, Federal Express Corporation v. State of Rhode Island,* 664 F.2d 830, 837–39 (1st Cir.1981); *New York Airways, Inc. v. United States,* 283 F.2d 496, 498–99 (2d Cir.1960).

 No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another. 14 C.F.R. § 91.9. Pilots must maintain a sharp lookout so as to "see and avoid" other aircraft. 14 C.F.R. § 91.67(a). A pilot's duty to see and avoid other aircraft is not excused because he may have to look thoroughly and diligently in another area. *See United States v. Miller,* 303 F.2d 703, 709 (9th Cir.1962). If air traffic control issues a direction or clearance that would, in the pilot's judgment, jeopardize the safety of the aircraft and its occupants, the pilot must reject the direction, and so inform air traffic control. *Thurston v. United States,* 888 F.Supp. at 1109; *accord, Webb v. United States,* 840 F.Supp. at 1484. If a pilot does not fully understand a clearance, or considers it unacceptable from a safety standpoint, he must request clarification or amendment of that clearance.

The FARs assign the ultimate responsibility for the operation of aircraft to the operators of the aircraft, not to the air traffic controllers. 14 C.F.R. § 91.3. The duties of pilots and controllers may be concurrent in some circumstances, but the *operational* control of the aircraft is assigned the pilot-in-command. *Texasgulf Inc. v. Colt Electronics Co.,* 615 F.Supp. 648, 661, n. 23 (S.D.N.Y.1984).

#### D. *Controllers' Duties and Responsibilities*

The United States Congress has enacted detailed policy on aviation and safety. *See, e.g.* 49 U.S.C. §§ 40101; 44501; 44503; 44505; 44506; 44701. The Administrator of the FAA is charged with developing procedures that will best meet the needs of civil aviation for safe and efficient traffic control of civil aviation. 49 U.S.C. §§ 40505. The Administrator annually reports to the House of Representatives the staffing standards used to determine the number of air traffic controllers needed to operate the air traffic control system of the United States, as well as projected budget requests. 49 U.S.C. §§ 40506(d).

 Air traffic controllers have a general duty to promote "the safe, orderly, and expeditious flow of air traffic." *Webb v. United States,* 840 F.Supp. at 1514. The law holds air traffic controllers to the standard of ordinary care with respect to their duties, which duties are concurrent with those of the pilots. *Management Activities, Inc. v. United States,* 21 F.Supp.2d at 1176; *accord, Thurston v. United States,* 888 F.Supp. at 1109; *Spaulding v. United States,* 455 F.2d at 226. The Air Traffic Control Manual, FAA Order 7110.65L ["ATC Manual"], sets forth the responsibilities of air traffic controllers, and related FAA policies and procedures. *See Webb v. United States,* 840 F.Supp. at 1514; *Management Activities, Inc. v. United States,* 21 F.Supp.2d at 1176.

Pursuant to statutory duties, the Administrator of the FAA has promulgated the ATC Manual. The ATC Manual is an FAA document, but not a statute or regulation. Air traffic controllers must be familiar with the provisions of the ATC Manual, and use their best judgment in complying. ATC Manual, § 1–1–1. An air traffic controller has a duty to prevent a collision between aircraft operating in the system. ATC Manual, § 2–1–1. An air traffic controller must give first priority to separating aircraft and issuing safety alerts. ATC Manual, § 2–1–1. Through teamwork, the air traffic controllers in the tower cab ensure the separation of aircraft. ATC Manual, § 2–10–3. An air traffic controller must issue a safety alert if he is aware that an aircraft is in a position which, in the controller's judgment, places the aircraft in an unsafe

proximity to other aircraft. ATC Manual, § 2–1–6.

The air traffic controller must issue airport condition information necessary for an aircraft's safe operation in time for it to be useful to the pilot, and *must provide information on parked aircraft on the movement area, including aircraft taxiways.* ATC Manual, § 3–3–3(e). Also, an air traffic controller must describe traffic information in a movement area in order to assist pilots in recognizing a potentially unsafe condition. ATC Manual, § 3–1–6. Pilots understand the terms "expedite" and "without delay" as nearly synonymous. ATC Manual 3–7–2(g).

 Nevertheless, air traffic controllers have no duty to warn a pilot of a condition of which he should already be aware based on his training, experience and personal observations. *Management Activities, Inc. v. United States,* 21 F.Supp.2d at 1177; *see also Thurston v. United States,* 888 F.Supp. at 1111; *Redhead v. United States,* 686 F.2d at 183; *Neff v. United States,* 420 F.2d 115 (D.C.Cir.1969). A controller has no duty to give his or her undivided attention to one aircraft where numerous other aircraft are under his or her control. *Management Activities, Inc. v. United States,* 21 F.Supp.2d at 1178; *Hamilton v. United States,* 497 F.2d 370, 376 (9th Cir.1974). Controllers may assume that pilots know and will abide by all applicable FAA regulations. *See Webb v. United States,* 840 F.Supp. at 1515; *Thurston v. United States,* 888 F.Supp. at 1111; *In re Air Crash at Dallas,* 720 F.Supp. at 1290; *In re Air Crash Disaster at New Orleans,* 422 F.Supp. at 1178—79.

## III. THE FACTS

This case arises from the collision of two single-engine aircraft, a Steen Skybolt bearing registration number N101DT, and a Cessna 152 bearing registration number N6285M [the "Cessna"] on March 29, 1998 at Orlando Sanford Airport in Sanford, Florida. Plaintiff Jeffrey Sexton was the pilot and sole occupant of the Skybolt. Robyn Foster, a student pilot, commanded the Cessna. ComAir, a flight school operating out of the Orlando Sanford Airport, owned the Cessna.

### A. The Orlando Sanford Airport

The Sanford Airport Traffic Control Tower is located at the Orlando Sanford Airport. The Air Traffic Manager is the highest ranking FAA official in the chain of command over the air traffic controllers at the airport. Under the Air Traffic Manager is the Tower Manager, who supervises the controller-in-charge. The controller-in-charge supervises the front-line air traffic controllers in their daily duties.

FAA air traffic controllers located in the tower coordinate the movement of aircraft into and out of the airport. Controllers also coordinate the movement of aircraft and ground vehicles operating on "movement areas" of the airport. The Sanford Airport Traffic Control Tower has positions for four air traffic controllers in its tower cab layout: "flight data and clearance delivery;" "local control 1;" "local control 2;" and "ground control."

The controller-in-charge decides when to combine or de-combine positions in the tower cab. Moderate traffic requires that the controller-in-charge de-combine Local 1 and Local 2 air traffic control positions. The controller-in-charge considers the weather and traffic when he decides whether to de-combine.[6] On March 29,

---

**6.** At trial, Tower Manager Barbara Kertie testified that the controller-in-charge considers the weather and traffic count, but added that "there is a lot more to it." According to Ms. Kertie, moderate traffic requires that the Local 1 and Local 2 positions be de-combined. She expects her controllers-in-charge to de-combine during moderate or heavy traffic. She was not in the tower on March 29, 1998, and has never been told what the traffic conditions were on that date. Ms. Kertie did review the air traffic control tape, however, and made her own judgment that the traffic

1998, Barbara Kertie was the Tower Manager, and "Mr. Griffin" was the controller-in-charge.

On March 29, 1998, the two local control positions were combined. In addition, the flight data and clearance delivery position was combined with ground control. At that time, Air Traffic Control Specialist ["ATCS"] Walter (Chip) Fallin was working the combined local control positions, and ATCS Todd Hurta was working the combined clearance delivery and ground control position.[7] The parties agree that Air Traffic Control Specialists are employees of the United States within the meaning of the Federal Tort Claims Act.

The two positions most relevant to the present action are local control and ground control. In general, the local controller is responsible for coordinating aircraft take-offs and landings. The local controller is also responsible for coordinating movement on the active runways. The ground controller is responsible for aircraft taxiing on taxiways to and from the active runways. The ground controller is also responsible for coordinating runway crossings, and for coordinating the movement of aircraft and ground vehicles on airport areas other than the active runways.

After landing, either immediately prior to or immediately after turning onto a taxiway off of the runway, the ground controller will give the aircraft taxiing instructions setting out the route to the aircraft's ultimate destination. The ground controller may clear an aircraft to taxi all the way to the terminal, or clear the aircraft only to an intermediate point en route to the terminal. The ground controller may give the aircraft an instruction to "hold short" of a given point. Where an aircraft is told to hold short of a runway, the aircraft is to taxi up to but not beyond the painted "hold bar" on the taxiway before the runway.

Ground controllers at Orlando Sanford Airport often direct pilots to stay to the right side (or to the left side) of certain taxiways in order to allow for opposite direction traffic. When a ground controller directs an aircraft to stay to the right side (or to the left side) of a taxiway, the aircraft will comply so that another aircraft can pass wingtip to wingtip in the opposite direction. Supervisory air traffic controllers expect ground controllers to issue a ground advisory if two aircraft are to pass on a taxiway in opposite directions. Supervisory air traffic controllers also expect that aircraft will taxi on the center line of a taxiway if no contrary direction is given from the tower.[8]

At Orlando Sanford Airport, Runway 9 Left and Runway 9 Right are parallel to each other, each running from East to West. Runway 9 Left is north of Runway 9 Right. Taxiway Lima runs south from Runway 9 Left, across taxiway Bravo, across Runway 9 Right, and into taxiway Charlie. Taxiways Bravo and Charlie run east and west, but taxiway Lima runs north and south. Taxiway Lima has a "hold bar" on each side (north and south) of Runway 9 Right.

The ground controller and the local controller must work in close proximity to each other in the tower cab—as a team.

---

was light to moderate, and that it did not feel very busy at all.

7. According to Hurta, the air traffic was "moderate to busy" on March 29. According to Fallin, the air traffic was "moderate." At trial, Fallin was unable otherwise estimate the traffic that day because "it is only one determining factor" in whether to de-combine. According to Tower Manager Kertie, all air traffic controllers have a close or consistent understanding about whether traffic is light or heavy.

8. According to Tower Manager Barbara Kertie in response to a question from the bench at trial, aircraft are expected to be on the center line of a taxiway if they receive no advice from the tower. Counsel for Sexton asked Ms. Kertie whether it is common to issue a ground advisory if two aircraft are both moving on a taxiway in opposite directions so that they will pass. She responded "I would think so."

Because the local controller is responsible for aircraft that are departing and landing on the runways, the ground controller must orally coordinate with the local controller before giving a taxiing airplane an instruction to cross an active runway.

For visual flight rules ["VFR"] departures out of Orlando Sanford Airport, the ground controller will issue taxiing instructions to the aircraft after getting a "progress strip" with departure information prepared by the clearance delivery controller. The ground controller prepares the strip himself when he has combined clearance delivery responsibilities. This strip is then placed on a strip board located near the local control position. The departure strips will generally be moved from left to right when the aircraft are ready for takeoff, and will be removed when the aircraft are cleared for takeoff. This procedure may vary depending on the volume of traffic, and the techniques of the individual controllers working the positions.

When an aircraft is taxiing to the runway for departure, or when it has exited a runway after landing, the pilot will communicate with the ground controller on the ground control frequency. During takeoffs and landings, the pilot will communicate with the local controller on local control frequency. At the time the accident occurred, the Skybolt was on ground control frequency and the Cessna was on local control frequency.

## B. *The People Involved*

Sexton has been flying for over twenty years, and is certified to fly under VFR conditions. Sexton is a private pilot. He is not certified for instrument flying, nor is

he certified for commercial flying. Sexton was well acquainted with the ground operations and the tower communication procedures at Orlando Sanford Airport. He had flown out of Orlando Sanford Airport since the early 1990s, usually once each weekend.[9]

Sexton's aircraft, the Steen Skybolt, is of a design known as a "tail wheel" aircraft, which is common in home-built and older aircraft. The full wingspan is 24 feet. In contrast with modern "tricycle" aircraft, a tail wheel aircraft has a small wheel mounted beneath the tail instead of beneath the nose of the aircraft. Although this arrangement makes no difference during flight, the "nose high" attitude of the tail wheel aircraft completely eliminates the pilot's forward visibility while taxiing.[10] As a result, the pilot of a tail wheel aircraft must steer his plane in "S-turns" to see directly in front of the nose of the aircraft. These S-turns are accomplished by steering the aircraft slightly to the right (about 25 degrees), and then slightly to the left while taxiing.

Sexton regularly flew his aircraft out of Orlando Sanford Airport. Sexton knew that the ground controllers often directed the pilots to stay to the right of the taxiways if they intended to use the taxiway for dual traffic. As a result, Sexton developed the habit of staying to the right side of the center line of a taxiway while taxiing at Orlando Sanford Airport. This also allowed him better visibility while taxiing and "S" turning.

Todd Hurta was the air traffic controller working the combined position of ground controller and clearance delivery position

---

9. Sexton gave straightforward answers to question from FAA counsel and from his own counsel. Sexton's testimony was credible.

10. The record contains no evidence as to whether the FAA certified the Steen Skybolt as airworthy—or as capable of safe operation on the ground—despite the pilot's inability to see in front of the aircraft while on the ground. [Joint Exhibit 18 was identified but not received in evidence]. In this case, the

FAA does not contend that Sexton violated any such regulation merely by operating the aircraft. It is clear, however, that many types of tail wheel aircraft with almost no forward visibility have been landing and taxiing at airports across the United States for many years. For many years, FAA's ground controllers have been giving taxiing instructions to pilots in tail wheel aircraft who cannot see in front of them.

at the time of the collision. Hurta twice saw the Skybolt on taxiway Lima after Sexton had first contacted him. Hurta did not remember seeing the Skybolt perform S-turns. According to Hurta, the Skybolt appeared to be on the right side of taxiway Lima before Hurta gave the instruction to cross Runway 9 Right. Hurta had previously given the Cessna an instruction to stay to the right side of taxiway Kilo and Charlie, and the Cessna appeared to Hurta to be on the right side of taxiway Lima as it was holding short of Runway 9 Right. According to Hurta, no instruction or safety alert was necessary because each plane was to the right of the taxiway centerline from each pilot's perspective.[11]

On instruction from the ground controller, opposite direction taxiing was common for smaller planes on certain taxiways, including taxiway Lima, at the Orlando Sanford Airport. Hurta did not always instruct aircraft to stay to the right of the center line. He would instruct aircraft to stay to the right while taxiing if in his judgment he felt that such an instruction was necessary. Hurta expected smaller aircraft that regularly flew out of Orlando Sanford Airport to stay to the right side of the center line while taxiing even when the ground controller had not instructed them to do so.[12]

The FAA has trained Hurta to have a generally familiarity with the flight characteristics of aircraft, but he is not aware of all of their different ground limitations. The FAA never trained Hurta to consider a pilot's inability to see forward when he was issuing taxiing instructions. Although Hurta had noticed that certain aircraft performed S-turns while taxiing, he had never flown in such aircraft and was not aware of their precise limitations in visibility.

Walter Fallin was the local controller on duty at the time of the incident. Fallin was controlling two active runways at the same time, Runway 9 Left and Runway 9 Right. He used the local control frequency. Fallin had instructed the Cessna to hold short of Runway 9 Right before the collision occurred. Ground controller Hurta had asked Fallin for permission to have the Skybolt cross Runway 9 Right. Fallin gave Hurta permission to cross the runway without delay because there was an aircraft on final approach. Fallin was concerned that the Skybolt must cross the active runway before the landing aircraft reached Runway 9 Right. As a local controller, Fallin viewed his highest priority as maintaining the separation of aircraft on the runways and in the air.[13] According to Fallin, the ComAir Cessna was the ground controller's responsibility even though she was on the local control frequency. Fallin therefore did not focus on the two taxiing aircraft, the Skybolt and the Cessna, but rather observed the position of the Skybolt solely in relation to the landing aircraft.

## C. The Collision

On March 29, 1998, the weather at Orlando Sanford Airport was clear, with ten

11. Hurta's testimony was heavily rehearsed, laden with self-interest, with responsiveness that varied depending on who asked the questions. His testimony became weak and vague when asked difficult questions. Although an employee of the United States, his credibility on central issues was moderate to low.

12. According to ComAir flight instructors Nicholas Edward Mech and Douglas Anderson, who testified for Sexton, pilots follow the Air Information Manual's advisory directing pilots to follow the center line of a taxiway unless otherwise instructed.

13. Fallin's testimony seemed wooden and inflexible—heavily rehearsed to parrot the FAA's position even when not responsive to a question. He answered questions that were different from those he was asked. He was very cautious, guarded, and defensive in answering questions from plaintiff's counsel, and often would not give a square answer. He responded eagerly to questions from the FAA's counsel. Fallin was simply not believable when he testified that he was merely making "suggestions" to pilots about interrupting transmissions, and not admonitions. Plaintiff impeached Fallin with his prior testimony on one point. Fallin appeared bitter, and less credible than Hurta.

miles visibility. According to the air traffic controllers, the air traffic either was "moderate" or "moderate" to "busy" on March 29.[14] A number of pilots, including student pilots, were practicing "touch and go" landings that day, some with the option of fully stopping. Joint Exhibit 1 ["JX1"].

The pilot of the ComAir Cessna informed the ground controller by radio that she was at Runup Area Two. At 2050:01 UTC ["Universal Coordinated Time" or "Zulu" Time], the ground controller instructed her to "ground taxi to runway niner right via the right side of taxiway Kilo and Charlie." JX2 at 14. At some time during the next four minutes, the ComAir Cessna switched from ground control to local control. At 2053:48 UTC, the ComAir Cessna informed the local controller that she was ready for takeoff on Runway 9 Right. LX1 at 32. Due to heavy radio traffic on the single local control frequency, the local controller had been issuing warnings to pilots to listen before "stepping on" the transmissions of others. JX1 at 21, 24, 25, 31, 32, 35, 40, 46. The local controller issued just such a warning to the ComAir Cessna's pilot after she reported being ready for takeoff. The local controller then told her [at 2053:51 UTC] to hold short. JX1 at 32. She thereafter remained on the local control frequency, holding on taxiway Lima just south of Runway 9 Right.

In the few minutes preceding Sexton's landing, ground control had given approximately fifteen instructions to aircraft to taxi via the right side of various taxiways. JX2 at 4—18. Ground control had also just instructed an aircraft to "without delay cross runway niner right remain right side of Charlie taxi to the ramp." JX2 at 15.

After a 45–minute flight, Sexton first contacted ground control at 2050:30 UTC when he was inbound five miles north of the airport. Joint Exhibit 1 ["JX1"] at 28.

At 2054:07 UTC, local control cleared Sexton to land. Sexton landed his Skybolt on Runway 9 Left. As Sexton was landing, the ground controller was ending a 45–second conversation with a Maule aircraft and a Cessna aircraft, during which conversation the ground controller directed each aircraft to remain on the left side of all taxiways so that they could pass right wing to right wing. JX2 at 18.

After landing, Sexton exited Runway 9 Left onto taxiway Lima, and began taxiing south toward the hangar as he performed slow S-turns. Sexton's Skybolt was traveling slowly at the pace of a jog, with the engine at idle. Sexton scanned taxiway Lima in front of him, but did not see any aircraft or other obstructions ahead of him. As he approached taxiway Bravo, Sexton contacted ground control at 2056:40 UTC, stating that he was "just clear of niner left at Lima." He asked for clearance to taxi to the T-hangars to the South. JX2 at 18. At first, the ground controller did not hear Sexton. After Sexton repeated himself, at 2056:54 UTC the ground controller instructed Sexton to "taxi straight ahead hold short runway niner right." JX2 at 19. Although the ground controller generally does instruct a pilot to keep to an aircraft to the right side of a taxiway when he wants the pilot to do so, the ground controller did not give such an instruction to Sexton this time.

After being instructed to "hold short" of Runway 9 Right, Sexton confirmed the "hold short" direction, and slowed his plane to a slow walk. He expected to stop. Sexton was about 100 feet from the hold short line of Runway 9 Right, but had not yet stopped. Twelve seconds after Sexton confirmed the "hold short" instruction, the ground controller [at 2057:10 UTC] instructed Sexton: "without delay cross runway niner right hold short of taxiway Charlie and uh break . . ." The ground controller broke into his radio instruction to

14. According to a supervisory air traffic controller, "moderate" traffic requires that the

Local Controller 1 and Local Controller 2 positions be de-combined.

Sexton at 2057:10 UTC to instruct the Maule aircraft also to cross Runway 9 Right at another location further west. JX2 at 19.

To the ground controller, the "cross without delay" instruction meant "do not come to a stop; do not slow down; do not do anything that is unnecessary." Sexton took the ground controller's instruction to "cross without delay" seriously, and added throttle to speed up to a fast jog. Sexton stopped performing S-turns because he could not safely perform S-turns while accelerating in compliance with the instruction. Sexton could not "without delay cross runway niner right" and safely perform S-turns at the same time. The S-turns would have caused him to delay.

Sexton was strapped tightly into his seat in the Skybolt due to his acrobatic work, and he was not able to see in front of his aircraft by leaning sideways to look out of the window. Sexton was not concerned with anything obstructing taxiway Lima on the other side of Runway 9 Right because he knew that the tower controller would have informed him of it. When he had achieved a high enough speed to cross the active runway, Sexton reduced his throttle back to idle.

At 2057:22 UTC, ground control resumed his instruction to Sexton "you make the right turn on Charlie continue taxi to the ramp have a good day." JX2 at 19. Sexton started to confirm at 2057:26, but cut off his transmission. At the last second after crossing Runway 9 Right, Sexton saw the Cessna off to the left in his field of vision. The Cessna was holding short on the south side of Runway 9 Right, angled to the left facing landing traffic, as it awaited clearance to take off on Runway 9 Right. The Cessna was on the right side (Sexton's left) of taxiway Lima, but the propeller may have crossed the center line. Sexton hit his brakes, but was unable to stop. The Skybolt's left wing collided with the Cessna's propeller, and the Skybolt spun around. At 2057:30 UTC, the local controller said "Oh! . . . [transmission cut off]" as he saw the collision. JX1 at 37. At 2057:33, the ground controller asked Sexton "Skybolt one delta tango you alright?" Sexton replied "uh that's affirmative." JX2 at 19.

The ground controller instructed ground traffic to hold their positions. JX2 at 19. The local controller also instructed other aircraft on the local control frequency to hold short and standby. At 2058:03 UTC, the local controller asked the Cessna if she was all right, and the pilot responded "we're okay." JX1 at 38. At 2058:30 UTC, ground control instructed Sexton to hold his position, and then coordinated ground assistance.

Sexton would not have complied with the instruction to "without delay cross runway niner right" had he been able to see the Cessna on the other side of the runway, or had the ground controller told him about it. Had he known of the Cessna, Sexton could have refused the controller's instruction to cross Runway 9 Right without delay.

No one was injured in the collision, but both aircraft reported substantial damage. According to the estimates for repairs of the Skybolt submitted by Sexton in his administrative claim to the FAA, the damage to the Skybolt required the replacement of wings and propeller, as well as removal and inspection of the engine.

## IV. APPLICATION AND ANALYSIS

### A. *Negligent Air Traffic Control Instruction*

 The Court agrees with Sexton that the local controller negligently authorized the ground controller to permit Sexton to cross Runway 9 Right southbound on taxiway Lima without alerting the ground controller to a Cessna also on taxiway Lima. The local controller had directed the Cessna to hold short just south of Runway 9 Right on taxiway Lima, and the Cessna remained there on the local controller's radio frequency. The Court also agrees with Sexton that the ground con-

troller negligently instructed Sexton to "cross runway niner right without delay" on taxiway Lima without telling Sexton that he would encounter a Cessna in front of him on the same taxiway on the other side of Runway 9 Right, and without instructing Sexton to stay to the right. The government's negligence was the sole proximate cause of the collision.

The Court rejects the government's argument that ground controllers have no duty to prevent taxiing aircraft from colliding on taxiways. It makes little difference under Florida negligence law whether the FAA generally reserves the technical term "separation" for aircraft that are landing or taking off.[15] Similarly, it makes little difference under Florida negligence law that the FAA views taxiing instructions as an "additional service" and not as a "duty priority." Where the ground controller undertakes to give taxiing instructions—and the pilots have no contradictory information suggesting that they may not rely on those instructions in order to prevent damage to property and loss of life—the FAA may not later hide behind the technical definitions of "separation" and "duty priority" when faulty instructions cause two aircraft to collide on the ground.

 Neither may the FAA hide behind the technical definition of "safety alert," a term designed to promote safety. A "safety alert" is required when a controller is aware that an aircraft is in unsafe proximity to obstructions or other aircraft. ATC Manual, 2–1–6. The Court rejects the government's contention that a controller has no duty to alert a pilot that his aircraft is about to collide with another aircraft on the ground because the definition of "safety alert" technically applies only to collisions with other aircraft in the air (i.e., at an altitude other than the altitude of ground level). ATC Manual, PCG S–1 ("safety alert" applies only to aircraft on the same altitude). It falls below the standard of care for an air traffic controller to

fail to alert a taxiing aircraft of a stopped aircraft known to be on a taxiway in front of him, and instead to allow the two aircraft to collide.

The ATC Manual provides that controllers "shall exercise their best judgment based on the facts and circumstances known to them" and shall perform "[t]hat action which is most critical from the safety standpoint." The Court does not read the ATC Manual as requiring a controller to perform only one action at a time. The ATC Manual does not prohibit a controller from performing—as soon as he is able—additional actions that are critical from a safety standpoint. No air traffic control system could function for very long if air traffic controllers were unable to balance a number of competing actions that are critical to safety. For example, a local controller must separate landing aircraft from crossing aircraft, and also must coordinate the safe crossing of active runways with the ground controller. If he cannot safely attend to a crossing request, the local controller should withhold authorization to cross until he has time to safely attend to the request.

In this case, the local controller had recently directed a Cessna (on the local controller's radio frequency) to hold short of Runway 9 Right on taxiway Lima. The Cessna remained on the local controller's frequency awaiting clearance for takeoff on Runway 9 Right, and was not in radio contact with the ground controller. Naturally, the local controller attended to an aircraft that was on final approach to Runway 9 Right. If the approaching aircraft required the local controller's exclusive attention over a period of time, the local controller should have withheld authorization for the Skybolt to cross Runway 9 Right until he had time to safely attend to the ground controller's crossing request. The Skybolt would have held short of Runway 9 Right safely awaiting clearance to

---

**15.** The ATC Manual defines "separation" as "the spacing of aircraft to achieve their safe and orderly movement in flight and while landing and taking off."

cross the active runway. Absent some assurance that the ground controller knew that a Cessna was holding short of Runway 9 Right on taxiway Lima, however, the local controller should not have authorized the Skybolt to cross Runway 9 Right on taxiway Lima knowing that the Cessna obstructed a good portion of taxiway Lima.

At some unspecified point, the ground controller claims to have seen the Cessna holding short on taxiway Lima.[16] The ground controller should not have directed Sexton to "cross runway niner right without delay" toward the Cessna on the same taxiway. Apparently, the ground controller believed that Sexton's moving Skybolt could safely pass the stationary but angled Cessna on the 75 foot taxiway. It was not reasonable, however, for the ground controller to expect that Sexton would keep all parts of his Skybolt fully to the right of the centerline of taxiway Lima when he crossed Runway 9 Right absent an instruction to do so. If the ground controller was to clear the Skybolt to cross Runway 9 Right, the ground controller should have warned Sexton to maintain the right side of taxiway Lima and to watch out for the Cessna in front of him.

The ground controller failed to give Sexton sufficient, accurate information about whether taxiway Lima was clear when he complied with the tower's "cross runway niner right without delay" instruction. Inadequate coordination between controllers during a busy period resulted in no communication to Sexton about the Cessna holding short. The accident was reasonably foreseeable from the government's negligent failure to provide accurate information about an obstruction in the taxiway. The government's negligent omission set in motion the chain of events which finally culminated in the collision.

■■ The United States contends that Sexton bears the sole responsibility for the collision because he "breached a duty to himself and others by failing to operate his aircraft in such a way as to avoid the collision." Specifically, the United States contends that Sexton failed to ensure that he could see the area in front of his aircraft before proceeding, and that he thereby violated federal regulations. Without doubt, the pilot in command is the person responsible for the safe operation of an aircraft. If the pilot in command doubts his ability to comply safely with an air traffic controller's instruction, he may decline to comply and may inform the tower of the reason.

Tail wheel aircraft, such as the Skybolt, have limited visibility of the area in front of the nose. Because of their nose-high attitude, these aircraft perform S-turns when taxiing in order to see forward. They cannot safely perform S-turns above a low taxiing speed. Sexton was acutely aware of the limitations of his aircraft, and took these factors into account before speeding up to "cross runway niner right without delay." Sexton could not cross Runway 9 Right without delay without accelerating to a taxiing speed that prohibited S-turns and prevented forward vision. Had Sexton continued taxiing across Runway 9 Right at a speed slow enough to perform S-turns, he risked collision with the landing aircraft, or risked causing the landing aircraft to abort its landing on an emergency basis. Had Sexton known of the Cessna, he would have come to a stop and advised the controller of his decision.

Sexton was not negligent.[17] He operated his aircraft in a manner consistent with

16. It is not possible to determine from this record precisely when the ground controller himself saw the Cessna. If the ground controller saw the Cessna early enough, the local controller's negligence in failing to warn the ground controller about the Cessna may not have been a proximate cause of the collision.

In any event, the ground controller's negligence was a legal cause of the collision.

17. The government denies liability, and therefore does not argue that Sexton's actions constituted "an intervening cause." In any event, the Court does not find that Sexton's compliance with the instruction to "cross

the FARs and good operating procedures. To the full extent permitted by his experimental tail wheel aircraft, Sexton maintained a sharp lookout to see and avoid other aircraft. Nevertheless, Sexton's restricted visibility prevented him from seeing and avoiding an obstruction that was known to the air traffic controllers. Sexton reasonably expected that the air traffic controllers would warn him of such a danger. Sexton fully understood the "cross runway niner right without delay" instruction. Unlike the controllers, Sexton neither knew nor should have known that the instruction was unsafe. Sexton had no reason to seek clarification of that instruction, or to reject it.

## B. *Negligent Failure to De–Combine*

Sexton contends that the government also is liable for a supervisory controller's negligent decision to rely on two individuals to man four air traffic control positions during a period of "moderate" to "heavy" traffic. The United States argues that it has not waived its sovereign immunity from suit for the discretionary functions of its agencies and employees. The government seeks immunity from suit for the decisions of air traffic control supervisors in the tower because they were exercising "discretionary authority" when they adjusted manpower in the Orlando Sanford Airport tower.

This Court could stop short of determining whether the government is immune from liability for negligent failure to de-combine two positions into four positions. Only the United States is subject to liability in a Federal Tort Claims Act case, and the Court has already found the United States liable for negligence. To decide the remaining issue is arguably tantamount to deciding whether the *air traffic controllers*

were negligent because of a work overload—or for some other reason.

Without doubt, an air traffic controller's ability to comply with the standard of care imposed by Florida law is closely related to the volume of his work. An air traffic controller's decisions are very often made under enormous stress and severe pressure that few other humans could withstand for very long. Many lives may depend on their decisions. The quality, reliability, and accuracy of an air traffic controller's fast-flowing decisions depend on whether he is required to manage only a manageable volume of air traffic.

In the event of an appeal, it may be of assistance to the Court of Appeals and to the parties to have a complete resolution of this case, without the need for a remand. The Court therefore proceeds to determine whether it has subject matter jurisdiction to decide—in light of the government's affirmative defense of sovereign immunity—whether a failure to de-combine air traffic control positions caused or contributed to the collision.

The United States is immune from suit by Sexton on each of Sexton's charges, except to the extent the government has waived its immunity. The FTCA authorizes suits against the United States for damages for loss of property caused by the negligent act or omission of any employee of the government if a private person would be liable under like circumstances. The United States has not waived its sovereign immunity from suit for the discretionary functions of FAA employees at any level, whether supervisory or on the operational front line. If Sexton claims that an air traffic controller or his supervisor has been negligent in the performance or failure to perform a "discretionary function or

---

runway niner right without delay"—or his decision to do so without S-turning—was so bizarre, extraordinary, and beyond the realm of foreseeability that, as a matter of fairness and policy, it should relieve the United States of all liability. It is "easily foreseeable" that

an accident may follow from an absence of important information. *Salas*, 511 So.2d at 547; *accord, Worthington*, 21 F.3d at 407, n. 8. The situation simply calls into play established principles of comparative negligence.

duty," then sovereign immunity bars the court from adjudicating Sexton's claim.

■ The United States bears the burden of proving its affirmative defense, the applicability of the discretionary function or duty exception. Without question, the decision of the controller-in-chief not to de-combine positions in the tower cab on March 29, 1998 was discretionary in nature (as were the decisions of the local controller and the ground controller to authorize and instruct Sexton to cross Runway 9 Right). The decisions involved an element of judgment or choice.

The only difficult issue is whether the decision of the supervisory controller not to de-combine involves the kind of judgment that is of the kind that the discretionary function exception was designed to protect, *i.e.,* "grounded in social, economic and political policy." Clearly, the discretionary function exception does not encompass every act and decision of an FAA employee that involves some element of discretion. The United States may be liable for the negligent decisions of air traffic controllers. *See Worthington v. United States,* 21 F.3d 399, 404 (11th Cir. 1994)(court of appeals had subject matter jurisdiction over FTCA case for air traffic controller's negligence). Indeed, the United States asserts no sovereign immunity defense with respect to the decisions of Hurta and Fallin, the front-line air traffic controllers in this case. Joint Pretrial Statement, Docket No. 25 at 19—20.

In determining the extent to which sovereign immunity bars a suit based on the controller-in-chief's decision not to de-combine, this Court must be careful to avoid any interpretation of the discretionary function exception that would immunize *every* governmental act—even the governmental acts by the line air traffic controllers. Virtually every act of the line air traffic controllers also involves some judgment or choice, and may easily be linked to

some general policy regulation of the FAA, such as the promotion of air traffic safety.

In determining whether the discretionary function exception applies to a particular type of decision by the supervisory controller-in-chief not to de-combine staff positions on March 29, 1998 requires this court to pinpoint the precise ·reach of the FAA policy in question. The parties have not assisted the Court in doing so, and have introduced almost no proof at trial on this issue. Although it is the Administrator of the FAA who is charged with developing procedures that will best meet the needs of civil aviation for safe and efficient traffic control of civil aviation, 49 U.S.C. §§ 40505, the Administrator relies on scores of upper-level administrators in the nation's capitol and around the United States to develop and revise federal regulations and procedures to be followed in the field. Their policy-laden choices are protected. But even the front-line air traffic controllers at Orlando Sanford Airport make daily choices and decisions that are critical to promote safe and efficient air traffic control.

This Court looks to the nature of the decision by the controller-in-charge, rather than to his status. But the status of the controller-in-charge—who is in the local tower cab only one step above his controllers—is not wholly irrelevant.[18] Although the evidence at trial is scanty, one would hardly expect the controller-in-charge to make choices that are informed by considerations of social, economic, or political policy, and that the controller-in-charge's official responsibilities include assessment of those considerations. Ordinarily, an employee working at the operational level in the tower cab is not responsible for policy decisions, even though policy considerations may be highly relevant to his actions. The controller-in-chief has a lower status. He is less likely to be authorized by the FAA Administrator to set policy, and more likely to be merely implementing the policy choices of others.

---

**18.** Hurta was qualified to act as a controller-in-charge.

The government understandably makes no claim that the discretionary choices by front-line air traffic controllers are the kind of discretionary decisions that are subject to protection. There comes a point at which the FAA's policy choices on safety and efficiency remain to be executed by low-level officials through routine, implementing actions. The locally-made decision of a controller-in-charge to combine or de-combine positions in the tower cab, on a daily or hourly basis as the air traffic and weather conditions vary, appears less like a decision based on immunized FAA policy than it does a non-immunized operational act.

Even if the controller-in-chief carefully considered the cost to the FAA of de-combining versus the benefit to air safety in deciding not to de-combine, nothing in the record shows that it was his responsibility to ponder such things. The Administrator of the FAA's decision to the same effect is protected, however, because weighing those considerations is his task. Although the government might argue that the controller-in-charge's decision not to de-combine was made in furtherance of the FAA's policy-grounded program of air safety, this proves too much. The same is true of the ground controller's decision to direct Sexton to cross Runway 9 Right without delay, for which the government claims no immunity.

The government might argue that a presumption arises that the staffing decisions of controllers-in-charge are grounded in public policy because the FAA's regulatory scheme for air traffic safety impliedly confers on them the discretion to make local staffing decisions. But those decisions are not grounded in regulatory policy even though they involve a significant degree of choice. An objective evaluation of the discretion conferred on the controller-in-charge based on this record reveals no more grounding in public policy than the decisions of the front-line air traffic controllers.

When a criminal sues the United States to recover damages for the allegedly negligent conduct of a law enforcement officer or corrections officer, the United States may be immune from nearly every decision or choice made by the law enforcement officer that furthers the law enforcement agency's policy decisions. Congress may well have intended to afford immunity in that context. But this Court is hesitant to ignore the intent of Congress in enacting the FTCA, and to extend that immunity to every discretionary operational decision of an air traffic controller or controller-in-charge. Almost any exercise of discretion by an air traffic controller could be overly parsed so as to amplify its relationship to a broad FAA policy made at a much higher level. But doing that obscures the very purpose of the FTCA. Such an overly-broad analysis would render the FTCA nugatory, and preclude liability for virtually every negligent decision.

The United States has failed to meet its burden of proving its affirmative defense, the applicability of the discretionary function exception. The Court finds that the decision to de-combine positions is made at the local level in the tower cab by a low-level supervisory controller-in-charge. Although the decision in question involves both judgment and choice, that judgment is not of the kind that the discretionary function exception was designed to shield. The government has no sovereign immunity for its negligent decision to under-staff the tower cab at the time of the collision.

The Court further finds from the air traffic control tapes, tape transcripts, and testimony of the air traffic controllers that the volume of air traffic was at least "moderate" at the time of the collision on March 29, 1998. The two air traffic control positions should have been decombined into four positions. Two individuals cannot be expected to perform the work of four men well—or even to meet the standard of care under Florida negligence law—under that volume of air traffic. Every day, hundreds of lives depend on their non-negligent per-

formance of their local control and ground control duties.

### C. *Damages*

Sexton initially claimed property damage in the amount of $42,247. JX5 He later amended his claim. JX6—9. On November 3, 1998, Sexton submitted an amended summary of damages to the FAA in which he claimed $50,172.20. JX8. This was the last statement of damages before the FAA administratively denied Sexton's claim on November 30, 1998.

At trial, Sexton proved damages to repair the Skybolt in the amount of $36,749.15, which includes removal, delivery, retrieval, and re-installation of the engine; engine and prop strike inspection; repairs for internal engine damage; replacement of the propeller; building new wings, "I" strut, covering and painting the wings; replacing damaged flying wires; reassembling and rigging the aircraft; and sales tax. JX1. The Court finds that the reconstruction could reasonably be expected to last fifteen months using an economical local repair facility, resulting in hangar rental during repairs of $3,523.05. Sexton did not prove as damages, however, his claim to reimbursement for the rental of substitute aerobatic aircraft for one hour per week over 66 weeks at $150 per hour, for a total rental fee of $9,900. The total damages proved, therefore, equals $40,272.20 (*i.e.*, $36,749.15 + $3,523.05).

### V. CONCLUSION

The Court finds the United States to have been negligent, which negligence legally caused the collision and damage. Sexton was not negligent. The Clerk shall enter judgment in favor of Plaintiff Jeffery Sexton and against the Defendant, the United States in the amount of $40,272.20, with no pre-judgment interest, such judgment to bear interest at the statutory rate.